[Civ. No. 1645.   Third Appellate District.—March 1, 1917.]

## COUNTY OF SACRAMENTO, Petitioner, v. JOHN S. CHAMBERS, as Controller, etc., Respondent.

COUNTIES—CLASSIFICATION—USE OF STATE MONEYS.—Counties are not municipal corporations or, strictly speaking, corporations of any kind, but are local subdivisions of the state, created by the sovereign power without the consent of the people who inhabit them, although they possess some corporate characteristics and may be within the inhibition of sections 22 and 31 of article IV of the constitution, against the drawing or appropriation of money from the state treasury for the benefit of a corporation or any institution not under the exclusive control and management of the state and against the making of any gift of such money to any individual or municipal or other corporation.

ID.—TUBERCULOSIS LAW—ACT CONSTITUTIONAL.—The act (Stats. 1915, p. 1530) providing for the establishment and maintenance of a bureau of tuberculosis under the direction of the state board of health and granting state aid to counties for the support and care of persons afflicted with tuberculosis, is not violative of article IV, section 22, of the constitution, providing that no money shall be

drawn or appropriated from the state treasury for the benefit of any corporation or institution not under the exclusive control and management of the state, or of article XI, section 13, providing that the legislature shall not delegate to a special commission the power to interfere with or supervise the affairs of counties, or of article IV, section 31, providing that the legislature shall not lend or authorize the lending of the credit of.the state or of any county in aid of or to any person for the payment of any liabilities of any individual, etc.

APPLICATION for a Writ of Mandate originally made to the District Court of·Appeal for the Third Appellate District to compel the State Controller to draw his warrant in favor of petitioner in payment of his claim arising under the state tuberculosis law.

The facts are stated in the opinion of the court.

Hugh B. Bradford, District Attorney, and Kemper B. Campbell, Attorney for State Board of Health, for Petitioner.

U. S. Webb, Attorney-General, and Robert T. McKisick, Deputy Attorney-General, for Respondent.

HART, J.—This is an original application for a writ of mandate to compel the respondent, as state controller, to draw his warrant in favor of the petitioner for the sum of $2,299.30, in payment of the claim of said petitioner arising under an act of the legislature of 1915, entitled: ''An act to provide for the establishment and maintenance of a bureau of tuberculosis under the direction of the state board of health; defining its powers and duties; providing for the granting of state aid to cities, counties, cities and counties and groups of counties for the support and care of persons afflicted with tuberculosis; making an appropriation therefor; and repealing certain acts of the legislature of the state of California.'' (Stats. 1915, p. 1530.)

The first section of said act provides: ''The state board of health shall maintain a bureau of tuberculosis for the complete and proper registration of all tuberculosis persons within the state; for supervision over all hospitals, dispensaries, sanatoria, farm colonies, and other institutions for tuberculosis, both public and private; for advising officers of the state penal and charitable institutions regarding the

proper care of tuberculosis inmates, and for such educational and publicity work as may be necessary; for administration of the fund for state aid to cities, counties, cities and counties and groups of counties for the care of patients who are county charges in city, county, or city and county tuberculosis wards or hospitals or in tuberculosis wards and hospitals maintained by any group of counties, and for the performance of such other duties as may be assigned by the said board.''

The second section provides that the state board of health shall appoint a director, who shall be duly qualified and trained in public health work. In addition to the administration of the bureau, under the supervision of the said state board, it is by said section made the duty of the director, ''and he is hereby vested with full power,'' to inspect and investigate, and have access to all records and departments of all institutions, both public and private, where tuberculosis patients are treated. ''He shall prepare annually for each institution a report of its rating on sanitary construction, enforcement of sanitary measures, adequate provision for medical and nursing attendance, provision for proper food, and such other matters of administration as may be designated. Administration of the fund for the care of patients who are county charges in city, county, and city and county tuberculosis wards and hospitals and the tuberculosis wards and hospitals maintained by any group of counties shall be based upon his reports and under the rules and regulations of the board.''

Section 3 provides that any city, county, etc., establishing a tuberculosis ward or hospital shall receive from the state three dollars per week for each person in the active stages of tuberculosis, cared for therein at public expense, who is unable to pay for his support and who has no relatives legally liable and financially able to pay for his support and who has been a *bona fide* resident of such city, county, etc., for one year; provided, that the city, county, etc., shall not become entitled to receive such state aid unless the tuberculosis ward or hospital conforms to the regulations of and is approved by the state bureau of tuberculosis. ''The medical superintendent of each hospital receiving state aid under this act shall render semi-annually to the state bureau of tuberculosis a report under oath showing, for the period covered by the report, (1) the number of patients in the active stages of

tuberculosis cared for therein at public expense, unable to pay for their own support and having no relatives legally liable and financially able to pay therefor, and (2) the number of weeks of treatment of each of such patients.''

The refusal of the respondent to draw his warrant in favor of the petitioner for the amount named in the petition is based entirely upon the claim that said statute, in so far as it authorizes the payment of the sums specified therein to cities, counties, etc., for the purposes stated in the act, is in violation of sections 22 and 31 of article IV, and section 13 of article XI of the constitution. His position, more specifically stated, is that the maintenance and support and the control of county hospitals constitute duties and burdens which the law casts upon the supervisors and the taxpayers of counties, and that the expense necessary to be incurred in supporting such hospitals is a county charge, citing sections 4223, 4041, subdivision 7, and 4307 of the Political Code. It is hence argued that, since county hospitals are not under the exclusive management and control of the state as state institutions, the proposed payment of money drawn from the treasury to counties, etc., for the purpose mentioned in the said act, is in contravention of section 22 of article IV of the constitution; 2. That counties are municipal corporations and that, therefore, the payment of such moneys to counties would involve a gift of the same, contrary to section 31 of said article; 3. That the act, in violation of section 13 of article XI of the constitution, attempts to delegate to the bureau of tuberculosis or the state board of health the power to control and supervise and thus interfere with the affairs of a county, to the extent to which the bureau or board may require the tuberculosis ward or hospital of such county to conform, in the management thereof, to the regulations established by said bureau, and to make reports thereto, as prescribed by the act.

Referring first to one of the several points made by the petitioner in support of the claim that the act in question impinges upon none of the provisions of the constitution within the inhibitions of which the respondent insists the act in question falls, it may be remarked: That it is well settled that counties are not municipal corporations or, strictly speaking, corporations of any kind. They are obviously lacking in the essentials which chiefly characterize and dis-

tinguish municipal corporations, and it has often been said that they do not come within the latter class of corporations. It is true that both municipal corporations and counties are governmental agencies, but the manner and source of their creation and the purposes, respectively, to subserve which they are brought into existence and activity are entirely at variance. "Municipal corporations proper are called into existence either at the direct solicitation or by the free consent of the persons composing them, for the promotion of their own local and private advantage and convenience. On the other hand, counties are local subdivisions of the state, created by the sovereign power of the state, of its own sovereign will, without the particular solicitation, consent, or concurrent action of the people who inhabit them. The former (municipal) is asked for, or at least assented to, by the people it embraces; and the latter organization (counties) is superimposed by a sovereign and paramount authority. . . . With scarcely an exception, all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy." (1 Dillon on Municipal Corporations, 5th ed., sec. 35.) Counties, however, possess some corporate characteristics. Like all involuntary political or governmental subdivisions of the state, they are classed as *quasi* corporations. But whatever may be their proper classification, we are not prepared to say that counties are not within the inhibitions of sections 22 and 31 of article IV of the constitution, against the drawing or appropriation of money from the state treasury for the benefit of a corporation or any institution not under the exclusive control and management of the state and against the making of any gift of such money to any individual, municipal, or other corporation of whatsoever kind or character. It is undoubtedly true that the design of the sections of the constitution invoked against the act in question was to prevent the appropriation of the moneys of the state for any purpose other than that which pertains to the state, and that an appropriation by the legislature of money from the state treasury for a purpose wholly foreign to any of the essential functions of the state government would clearly and unquestionably amount to a gift within the plain meaning and intent of section 31 of article IV. (*Stevenson* v. *Colgan,* 91

Cal. 649, 651, [25 Am. St. Rep. 230, 14 L. R. A. 459, 27 Pac. 1089]; *Bourn* v. *Hart,* 93 Cal. 321, [27 Am. St. Rep. 203, 15 L. R. A. 431, 28 Pac. 951].)

But we do not hesitate to express the opinion that the provision of the act in question authorizing the payment to counties of the sums to be used for the purpose therein specified is not in contravention of the sections of the constitution just adverted to. Nor are we impressed with the argument that said provision of said act is obnoxious to the objection that it offends section 13 of article XI of the constitution, in that it involves an attempt by the legislature to delegate to "a special commission," etc., the power to interfere with or supervise the affairs of counties or to "perform any municipal function whatever."

It has never been, nor will it ever be, questioned that, among the first or primary duties devolving upon a state is that of providing suitable means and measures for the proper care and treatment, at the public expense, of the indigent sick, having no relatives legally liable for their care, support, and treatment, those who are infirm and helpless from the ravages of advancing years and without means of their own or relatives upon whom the law places responsibility for their care and support, and the insane, likewise situated as to means necessary for their care, support, and safekeeping. (Cooley on Taxation, p. 204.) Nor can it for a moment be doubted that it is the duty of the state to take all necessary steps for the promotion of the health and comfort of its inhabitants and to make such regulations as may be conceived to be essential to the protection of the state and the people thereof, so far as such result may be attained, against the visitations and prevalence of deadly epidemical and endemical diseases, and to take and prosecute such health and sanitary steps and measures as will result in stamping them out, or, by recognized methods of scientific treatment, reducing to the lowest possible minimum the percentage of fatalities following therefrom. These are duties which the state owes to its inhabitants for the protection, promotion, and the preservation of their general happiness and welfare; and, as is true of the duty of the state in the matter of taking proper care of the impecunious or indigent who are afflicted with disease and who have no means for caring for themselves or relatives legally responsible for such care, they are duties

which the state may perform in the exercise of its sovereignty, even in the absence of direct constitutional authority therefor—indeed, duties which it may discharge under its inherent power of police.

But we do not understand that it is claimed by the respondent that the duties to which we refer do not rest upon the state or that the state is without the power to execute them. In fact, as we understand the position of the respondent, it is not claimed by him that the sections of the constitution invoked against the validity of the legislation involved in this dispute were intended to have the effect of prohibiting the state from performing the duty or exercising the power of which we have been speaking. In such a case, these questions may arise, however: Whether the state has shifted the burden of those duties upon the counties, and, if not, whether, in the exercise of the power whereby it may perform those duties, the state has adopted a mode or method of doing so which is not discountenanced by any of the provisions of the constitution. In this case, the fundamental proposition upon which the respondent builds up his argument against the constitutional propriety of that provision of the act in question which authorizes the payment of certain sums to the counties for the purpose stated therein is that the state has made it the duty of counties to maintain hospitals for the care, support, and treatment of the indigent sick, and that therefore the burden of supporting such hospitals is upon the counties and not upon the state.

The constitution nowhere places the burden of maintaining, supporting, caring for, and treating the indigent sick upon the counties of the state. The legislature, however, in the exercise of its duty and power to establish a system of county governments (section 4, article XI, constitution), has, in fixing and enumerating the powers of boards of supervisors of the counties, authorized said boards to establish and maintain county hospitals, prescribe rules for the government and management thereof, and appoint county physicians and the necessary officers and employees thereof, who shall hold office during the pleasure of the board (Pol. Code, sec. 4223); to build or rebuild, furnish or refurnish hospitals and almshouses (Pol. Code, sec. 4041, subd. 7); and has further provided that the necessary expenses incurred in the support of the county hospitals, almshouses, and the indigent sick and

otherwise dependent poor, whose support is chargeable to the county, constitute county charges (Pol. Code, sec. 4307, subd. 7).

As stated, upon the foregoing provisions of the Political Code the argument is erected that, the state having transferred to counties the duty and burden of maintaining hospitals for the care, support, and treatment of the indigent sick, an appropriation of any moneys from the state treasury for the support of such afflicted persons amounts to a gift, and is therefore in violation of the constitution, and that the statute in question not only runs up against that inhibition of the constitution, but violates the other sections of the organic law above referred to for the reasons heretofore stated.

There is no doubt that the legislature, by the legislation above referred to, intended to and did transfer from its own shoulders and so placed upon the counties the duty and burden of caring for, supporting, and treating the classes of persons mentioned.   But this does not mean that the state has thus forever surrendered all control over those matters or the right itself to exercise full and complete and exclusive jurisdiction and control over hospitals for the indigent sick and helpless paupers.   As before stated, the constitution does not require this burden to be borne by the counties.   The state may so transfer it to counties, however, in the exercise of its sovereignty.   As we have seen, counties are mere agencies of the state, the functions of whose organization are, to the extent of the territorial limits of their geographical divisions, concerned with the administration of the general governmental policy of the state, "and are, in fact, but a branch of the general administration of that policy."   All the people of the state, while not directly interested in the administration of the affairs of municipal corporations of which they are not members, are so interested in the administration of the governmental affairs of a county, whether they reside or own property therein or not, because, as stated, such administration involves, to the extent of the geographical limits of a county, the administration of the affairs and policy of the state.   The state may, through its legislature, and in the exercise of its sovereign power and will, in all cases where the people themselves have not restricted or qualified such exercise of that power, apportion and delegate to the counties any of the functions which belong to it.   On the other hand, the

state may take back and itself resume the exercise of certain functions which it had delegated to those local agencies; and, in some cases, particularly those having reference to the state's police power, we know of no reason, constitutional or otherwise, why the state and the counties may not act conjointly and synchronously in carrying out the policies of the former. Indeed, an analogy to the latter situation may be found in the matter of the regulation by the state of the right to pursue and kill wild birds and animals. By an act of the legislature of 1909 (Stats. 1909, p. 663), the authority to issue licenses for such hunting and killing is vested not only in the state board of fish commissioners, but also in the county clerks of the various counties of the state. The act requires the last-named officials, upon application therefor, to issue such licenses, to receive the fees therefor, to account for the same to the state controller every three months, and pay all sums so received into the state treasury, they (the clerks) to receive as their compensation for the services so performed out of the state "game preservation fund" ten per cent of the amounts accounted for. (*County of Sacramento* v. *Pfund,* 165 Cal. 84, [130 Pac. 1041].) This so-called "game law" does not, it is true, make the collection of the licenses therein provided for a function of the county organization. But it is very clear that it does employ a part of that organization's machinery for carrying out its policy with respect to a branch of its own functions, and we doubt not that it could have devolved that duty upon the counties themselves, designating the particular officers thereof to discharge it, and have provided that the compensation for such service should be paid into the treasury of the county from the state fund mentioned in that act, in which case it would not be contended or held, as it has never been contended or held under the provisions of the present game law, that the payment for the service so performed for the state out of moneys in the state treasury would involve a gift of such moneys within the inhibition of section 31 of article IV of the constitution or an appropriation or the drawing of money from said treasury in violation of section 22 of said article. The game law, however, as before suggested, stands as a concrete example of the proposition above explained, viz.: That the true purpose of county government organizations is to perform functions which belong to the state itself, and that the latter may employ them, either jointly

with itself or alone, as instrumentalities in aid of the administration or the carrying out of its own general governmental functions and policy.

The act in question does not, it seems to us, go any further than the act regulating the right to pursue and kill wild game and animals, above referred to. It does not purport to nor does it involve an appropriation of money for the support or in aid of the support of county hospitals. As a matter of fact, there is no such institution as a county hospital as a separate entity. As has been shown, the legislature has authorized or empowered the supervisors of counties to establish and maintain, at the expense of taxpayers of counties, hospitals at which the indigent sick and infirm, otherwise eligible to the public bounty in that particular, may receive proper care, support, and medical treatment. The power to maintain such establishments, like that whereby the counties may build and maintain public roads and highways, or administer public justice, is only a part of the general scheme established by the legislature whereby those political subdivisions are required to exercise and perform certain of the functions of the state which the latter, for convenience and economy, has elected to commit to them. As above declared, the state may, if it so elects, assume entire control of the matter of caring for and supporting and administering aid to the classes of persons for whose benefit county hospitals are established and maintained. It has the right and the power to establish and maintain, under its own exclusive control and management, hospitals for such purposes, and so entirely relieve counties of that duty and burden. And, having the right and the power to take upon itself entire responsibility for the support and the treatment of all such persons, it has the undoubted right and power to take exclusive or only partial control and assume corresponding liability for the care, treatment, and support of a portion or a certain class of such persons, or those only who are afflicted with a particular kind of malady. By establishing state hospitals, under its exclusive control and management, where the insane and feebleminded are maintained and given medical treatment, the state has exercised this very right and power. And it is in effect what it has done in this case.

Tuberculosis is a deadly disease, fatal almost in every instance, unless, in its earliest stages, its progress is arrested

and the tubercle bacilli are destroyed. That it is a contagious disease or one that is by contact transmissible from a victim of the malady to one not so afflicted, is a thoroughly established scientific fact. By health statistics and data gathered and published by the public health department of the state government, it has been shown that over one-seventh of all the deaths in California, prior to the passage and enforcement of the law here under attack, were caused by this dread and justly dreaded disease, and that, down to the time mentioned, the ratio of deaths from tuberculosis was constantly increasing. Incidentally, it may be observed that, according to verified and authentic statistics gathered and prepared by the same official authority, there has been in California a marked and readily noticeable decrease in deaths from said cause since the passage and enforcement of this statute.

There are still in California, however, as we learn from the official reports of the said health department, large numbers of persons suffering from this deadly disease, mostly in the form of attacks upon the pulmonary organs, very many of whom are without financial means to pay for their own support and medical treatment and without relatives legally liable or financially able to give them support and the care and treatment indispensable in such cases. The existence of such conditions is obviously a positive menace to the health of the inhabitants of the state.

But it has been demonstrated that by special scientific treatment, under favorable sanitary and general health conditions, tuberculosis, when not advanced to its final stages, may be cured; but that, unless such conditions are established and uniformly maintained, the difficulty of securing restoration of the patient, however able, persistent, and scientific may be the medical treatment, becomes in most cases insuperable.

Considering and finding all these facts, as we must assume that it did, the legislature has adjudged that drastic or at least more than the usual or ordinary precautions taken to guard and protect and preserve the public health should be provided for and taken against the spread of this well-nigh implacable destroyer of human life. That body conceived, as certainly there was real, substantial, and alarming occasion for conceiving, that measures should be adopted requiring the subjection of the disease to the strictest surveillance, to the

end that spread of the disease by the indiscriminate inter-
communication of its victims with the public at large might be
prevented, and to special medical treatment and scientific
nursing, under such scientifically arranged and maintained
conditions as the latest and most scientifically conducted in-
vestigations and experiments have demonstrated to be all-
essential to successful treatment of the malady.   The manifest
purpose of the statute is therefore twofold: 1. To succor those
indigents who are afflicted with tuberculosis and who have no
relatives legally liable for their support, maintenance, and
treatment, or, if legally liable, having no financial means to
discharge the liability; 2. To prevent the spread of the disease.

The state, to attain these ends, has, by the statute in ques-
tion, and in the exercise of its sovereignty—indeed, in the
exercise of its police power—assumed the right and authority
to control the matter of the care and treatment of those
indigents who are legally entitled to be cared for and treated
at public expense and who are afflicted with tuberculosis; but,
in the place of erecting and maintaining hospitals or sanatoria
for that purpose in various parts of the state, which it would
have a right to do, it has employed the counties—its agents
in the administration of certain of its functions of govern
ment—as instrumentalities for or aids in controlling and man-
aging that branch of its governmental duties and policy.
That this is the true analysis and exposition of the object
and intent of the statute in controversy here is evidenced
by the provisions that, as conditions to the payment to the
counties of the money therein provided for, the latter must
establish tuberculosis wards or hospitals in compliance with
regulations established by the state bureau of tuberculosis,
that the medical superintendent of such wards or hospitals
must render, semi-annually, to the said state bureau, a report
under oath, showing the number of patients in the active
stages of tuberculosis legitimately cared for therein at public
expense and the number of weeks of treatment of each such
patients, and that the director of the state bureau may have
full power to inspect and investigate, and have access to all
records and departments of all institutions, both public and
private, where tuberculosis patients are treated, and must
prepare annually for each institution a report of its rating on
sanitary construction, enforcement of sanitary measures, ade-
quate provision for medical and nursing attendance, provision

for food, and such matters of administration as may be designated, etc. The latter provision—giving the state's agents the authority to inspect and investigate private tuberculosis hospitals—is indicative of the importance attached by the state to the exercise of special care in the matter of the treatment of tuberculosis and the maintenance of the most favorable sanitary conditions and surroundings wherever victims of that disease may be cared for and treated. The state undoubtedly has the right, under its police power, to adopt sanitary or other appropriate regulations, applicable to the whole state and to private as well as to public tuberculosis sanatoria, looking to the stamping out of the disease and the prevention of its increase, and thus to the protection of the public health. With respect to county tuberculosis wards or hospitals, it proposes by the law in question to do no more than this. In authorizing the payment by the state of the sum named in the act to counties maintaining such wards or hospitals according to regulations formulated and promulgated by its health department, the legislature did not intend, nor was it the object of the act, to appropriate the state's money to or for the benefit of counties, but only to facilitate the proper execution of its scheme to control in part or itself supervise the matter of the treatment of indigent tuberculosis patients, legally entitled to be taken care of at public expense. Obviously, the counties, to which these moneys are authorized to be paid, are, as to such money, mere trustees of an express trust, with absolutely no authority or right to divert the use of the same to any other than the purpose or object for which it has been expressly appropriated by the state. As repeatedly herein declared, we can perceive no sound reason for holding that it is not within the competence of the state to enter into such an arrangement with the counties under its broad and comprehensive and essential sovereign power—that power, unhampered by constitutional restrictions, except, perhaps, as to the mode and manner of its exercise, under which the state is not only authorized, but it is its duty to make and enforce all such reasonable rules and regulations as may be necessary and conducive to the promotion and preservation of the general health, happiness, and welfare of its inhabitants. Thus it is very clear that, in enacting the law with which we are here concerned, and thereby making an appropriation of the state's money for the proper carrying out of

the plan therein set forth for the care and suppression of a dangerous contagious disease, the state has not transcended but has remained within its rights as a sovereign commonwealth. Thus it does not make a gift of the public money in contravention of the thirty-first section of article IV of the constitution, nor appropriate the money of the state to the use or benefit of the corporations or associations or institutions specified in section 22 of said article. Nor, under our view as above set forth as to the nature of the power under which the state has proceeded in the enactment of the law in question, should it be necessary to suggest that the provision of the last-named section of article IV of the constitution expressly authorizing the state to grant aid to institutions conducted for the support and maintenance of certain classes of persons (minor orphans, half-orphans, etc.), even when viewed by the light of the rule of construction, *expressio unius est exclusio alterius,* does not preclude the state from the exercise of the right to apply its police power on all proper and appropriate occasions, and to pass laws, such as the one before us, whose purpose is to protect the lives, health, and general happiness of its inhabitants. And it is equally patent, for reasons already given, that the act does not authorize the state bureau of tuberculosis or the state board of health to interfere with or supervise counties, their property or affairs. As stated, the supervisory control exercised by the state under the act is over the tuberculosis patients in the hospitals of those counties conforming in their treatment of those cases to the regulations of said state bureau.

It is conceded that the petitioner maintains a tuberculosis ward in connection with its county hospital conforming in all particulars to the rules established by the state bureau of tuberculosis for the regulation thereof.

In accordance with the foregoing views, the demurrer interposed by the respondent to the petition is hereby overruled, and a writ of mandate is hereby ordered to issue out of this court directed to said respondent, commanding him to issue to and in behalf of the petitioner his warrant for the amount named in the petition.

Chipman, P. J., and Burnett, J., concurred.