[Civ. No. 3243.   Third Appellate District.—July 26, 1927.]

CENTRAL PACIFIC RAILWAY COMPANY (a Corporation), Appellant, v. AUGUST COSTA et al., Respondents.

H. W. Hobbs for Appellant.

Henry B. Neville for Respondents.

HART, J.—The petitioner Railway Company petitioned the court below for an alternative writ of mandate to compel the respondents, as members of and constituting the board of supervisors of the county of Sierra, to enter upon the minutes of said board an order directing the auditor of said county to cancel certain assessments of taxes levied upon certain real property of petitioner and, further, to cancel the certificates of sale of said lands and ''any deeds to the state executed in pursuance of said sale,'' or to show cause why they have not done so upon applications theretofore made by petitioner to the respondents for such cancellation.

The sales of the real property described in this proceeding were to the state (Pol. Code, sec. 3771) for delinquent taxes assessed thereon by the county of Sierra for the years 1899, 1902, 1903, 1904, and 1908.

The trial judge set forth the reasons for the denial of the relief prayed for by petitioner in a written opinion, which was filed by him and which opinion is printed in the transcript. A statement of the case and the issues submitted by the pleadings (the petition and the answer or return) is correctly set forth in said opinion as follows:

''This is an application for writ of mandate commanding the Board of Supervisors of Sierra County to enter an order upon the minutes of said Board directing the Auditor of said County to cancel certain purported double assessments of the property of petitioner.

''It is alleged by petitioner that, at all times mentioned in the petition, it was the owner of certain tracts of land described by legal subdivisions; that for the fiscal year commencing July 1, 1899, the County of Nevada, acting by and through its duly constituted officers, assessed for State, County and school purposes certain tracts of said lands of petitioner; that petitioner has paid all of the taxes levied and assessed thereon by the County of Nevada; that for said fiscal year commencing July 1, 1899, the County of Sierra, acting by and through its duly constituted officers, assessed for State, County and school purposes the same tracts of said lands of petitioner; and that petitioner failed to pay

said taxes, so assessed by the said County of Sierra, and said lands were sold to the State of California on July 2, 1900.

"The petition contains similar allegations regarding various tracts of the said lands of petitioner, which were assessed by Nevada County for the fiscal years commencing July 1, 1902, 1903, 1904 and 1908 and by the County of Sierra for the same years; and it is alleged that petitioner has paid all of the taxes levied upon said lands by the County of Nevada for each and all of said years, but failed to pay the taxes levied by Sierra County for any of said years, and that the lands so assessed by Sierra County have been sold to the State.

"It is further alleged that on or about the 2nd day of July, 1923, petitioners filed with respondents, as members of and constituting the Board of Supervisors of the County of Sierra, its application in writing that said Board of Supervisors make and enter upon its minutes orders directing the Auditor to cancel said assessments, so made by the County of Sierra, by entries on the margin of the assessment book and also upon the delinquent list, should such assessments be carried therein, and directing the Recorder to cancel the certificates of sale and deeds to the State; that with each of said applications, petitioner presented to and filed with respondents a certificate signed by the Auditor of Nevada County, stating that the lands described in said applications had been assessed for taxes for the fiscal years in question, and that all of said taxes had been paid, as required by Section 3804 (b) of 'the Political Code.

"And it is finally alleged that respondents have wholly refused and neglected and do continue to refuse and neglect to make and enter in their minutes the orders so applied for, and that said tax sales appear to be valid on their face and constitute clouds upon the title of petitioner to said lands, and that petitioner has no other plain, speedy or adequate remedy in the ordinary course of law.

"In their answer to the petition, respondents 'admit each, every and all of the averments of the petition of petitioner in its petition set forth.'

"The respondents aver in their answer that during all the times mentioned in the petition, prior to the first day of March, 1909, the lands described in the petition and the whole thereof were situated within the exterior boundaries

of Sierra County and at all such times were a portion of the territory of said County; that the taxes levied upon said lands of petitioner by the County of Sierra, as stated and set forth in said petition, became, were and still are the property of and are now due and payable to the County of Sierra and the State of California as the interest of each appears. It is further averred that petitioner has been guilty of laches and unreasonable delay in making its applications to have said assessments cancelled, and that by reason of said laches respondents and their predecessors in office have been and are deprived of the opportunity and right to litigate and have determined the claims of said County of Sierra relative to said assessments and the taxes accruing therefrom.

"Respondents also plead, in their answer, the defense that the cause of action set forth in petitioner's petition is barred by subdivision one of Section 338 of the Code of Civil Procedure and by Section 343 of the same Code.

"Petitioner's applications for orders cancelling said assessments and its petition in this proceeding are based upon that portion of Section 3804 (b) of the Political Code, reading as follows:

" 'Where real property has heretofore been assessed by the assessors of two or more counties for the same year and the owner thereof has paid all of the taxes on one of such assessments, upon proof of the payment of such taxes on one of such assessments for any year, by the production of a tax receipt or certificate of the auditor of the county in which such payment has been made, the board of supervisors of any other county claiming the right to assess and tax such real property, shall thereupon. enter an order upon its minutes directing the auditor to cancel such double assessment of such property by an entry on the margin of the assessment book, as also upon the delinquent list, should such double assessment be carried therein. If the property assessed under such double assessment has been sold to the state and a certificate of sale or deed therefor has been issued to the state, the order of the board shall further direct the recorder to cancel such erroneous certificate and deed so issued except where the state has disposed of the property thereby conveyed.'

"Said section was added to the political code in 1917 and took effect July 27th of that year, but petitioner did not apply to respondents for the cancellation of said assessments until nearly six years thereafter, to-wit: on July 2, 1923.

"Petitioner contends, however, that its cause of action—its right to commence and prosecute this proceeding—did not accrue until it had applied to the respondents for the orders of cancellation of the assessments in question, and, therefore, that it has not been guilty of laches and that the statute of limitations had not run against it at the time of the institution of his proceeding."

The petition does not state, either directly or indirectly, that the lands involved herein are not situated within the boundaries of Sierra County. On the other hand, as will be observed from that part of the trial judge's opinion herein above presented, the answer or return alleges that said lands and all and every part thereof are and were, at the times of the assessment and sale thereof to the state on account of delinquency on the part of the owner in the payment of the taxes thereon for the years stated in the petition, situated within the boundaries of the said county. No evidence was received at the hearing of the proceeding, hence the judgment is founded upon the facts as they were stated in and admitted by the pleadings (the petition and the answer or return thereto) and is in effect a judgment on the pleadings. The court, nevertheless, specifically found that all of the material allegations of the petition are true, but concluded, as a matter of law, that "the petitioner is not entitled to a writ of mandate as prayed in the petition because its right is barred by the statute of limitations, and also by laches, and that respondents are entitled to a judgment dismissing the proceeding and awarding them costs."

The petitioner appeals from the judgment.

For the purpose of this decision, it is to be accepted as a fact in this case that said lands are and were at all times referred to in the petition situated within the boundaries of Sierra County. It is further to be accepted as established facts in this case that said lands, in the years named in the petition, were assessed and taxes thereon levied for county purposes by the county of Nevada, and that the petitioner paid to Nevada County the taxes so assessed and levied by said county for the years referred to.

While it is true, as is stated in that part of the opinion of the trial judge hereinabove reproduced, that the respondents, in addition to setting up the defense of laches and the bar of the statute of limitations against the right of the petitioner to maintain the proceeding inaugurated by its petition herein, also have expressly set up in their answer the plea, or, more accurately speaking, have expressly interposed the proposition, as in impeachment of the right claimed by the petitioner to the relief it seeks to obtain by this proceeding that those provisions of section 3804 (b) of the Political Code, according to which the petitioner has proceeded herein, would, if given application in harmony with the prayer of the petition, have the effect of depriving the county of Sierra of a property right, to wit, the taxes assessed or levied on said lands, without due process of law. The court, however, in deciding the case, ignored the last stated proposition, and the district attorney, in his brief filed herein, has not referred thereto, from which it may be assumed that he has abandoned or surrendered the point. For this reason, further notice herein of the point could be waived, a rule which the courts of appeal are strongly inclined to follow unless, perhaps, the point presents a proposition of law peculiarly vital to the decision and which, upon its face, is plainly subject to debatable considerations. But, since said section is a comparatively new legislative enactment and authorizes a proceeding for the relief of a property owner from the effect of a double tax on his property, and, furthermore, since, so far as we are advised to the contrary, the appeal courts of this state have thus far not been afforded an occasion for considering the section or inquiring into the question (if it be a question) whether it is consistent with the constitutional authority of the legislature to enact or pass such a measure into law, it is deemed not improper to give to the legislation involved in the act, with respect to the question whether its enactment constituted a competent exercise of legislative power, some consideration herein.

It will readily be noted, upon reading section 3804 (b) of the Political Code, that said section requires the board of supervisors of a county in any case to which its provisions and obvious purpose are appropriate, and where application is made by the owner of real property to such board for

relief under and in pursuance of the provisions thereof, to direct a cancellation of the assessment levied, regardless of whether such property is or is not situated in the county wherein such application is made. In other words, as the statute reads, the situs of the real property is an immaterial consideration, and, therefore, upon the filing of the application for the cancellation of the assessment by the owner, with the required proof that he has paid to another county taxes on the same property for the same year, upon an assessment thereof by such other county, there is no alternative left to the board of supervisors of the county in which such application and proof have been made but to order the auditor of such county to cancel the assessment on such property. It is upon this proposition that the respondents contended in the court below that section 3804 (b) of the Political Code, as so applied, and as it was obviously intended to be applied, will operate to deprive Sierra County of its just taxes on the lands involved without due process of law.

Obviously the act, in its nature and purpose, is remedial. It gives to the owner of real property circumstanced with reference to the assessment of such property for revenue raising purposes as the act contemplates, a remedy whereby he may, by a summary proceeding before the supervisors (and not before the courts), relieve himself from an unequal and unjust tax burden. And the legislation involved in the act is consistent with and in furtherance of the ends of the positive policy of the state to discountenance and disallow any act or course of official conduct on the part of the state or its agents charged with the administration of the fiscal or revenue system of the state which would result in or lead to the imposition upon real property owners of a tax burden amounting to double taxation.

It is no doubt true that, prior to the enactment of section 3804 (b) of the Political Code, there were available to the owners of real property a number of different remedies, the election of which was or is governable by the circumstances peculiar to the particular case, whereby such property owners were or are enabled to relieve themselves from the illegal burden of double taxation brought about by such conditions as furnished the legislative motive for the enactment into law the provisions contained in said section. These

remedies, though, when resorted to or invoked, pertain or are solely appropriate to judicial proceedings, and, when thus called into action, are usually attended by the expense, the inconvenience and the delay in securing final judicial adjudications of the questions involved incidental to the litigation of contested questions of property rights before the courts. Instances of double taxation due to disputed county boundary lines are not wanting. The present case, as we may infer from the briefs, furnishes such an instance. (See *County of Sierra* v. *County of Nevada*, 155 Cal. 1 [99 Pac. 371].) Other such cases, as we know as a matter of common knowledge, have arisen in the history of California, in which the excess tax following from the assessment of the same lands for the same years by two different counties, each county proceeding upon the assumption that such lands were situated within its exterior boundaries, thereby imposing upon the lands an illegal tax burden, and in which the amount involved was so small as to make it not worth the time, trouble and expense to litigate and so secure an adjustment or adjudication of the matter in an appropriate proceeding by the courts. But, in such instances, if one of the assessments be not nullified, or if both assessments be enforced, the state would receive and retain a larger amount of taxes upon such lands than it would be entitled to, and at the same time the state itself would be forced or involuntarily driven into the position of impinging upon its own policy of equality, or as near equality as is reasonably practicable in the distribution of the burdens of government among property owners within its borders. Such a situation, it may be repeated, might have occurred, and in all probability has occurred, in some cases, prior to the enactment by the legislature of 1917 of section 3804 (b), providing a summary and simple and inexpensive and convenient remedy for relief in instances such as we have before us now. Furthermore, since, as we have seen, said section (where there have arisen the circumstances which call for its actual application) plainly contemplates that it is the imperative duty of the board of supervisors to which application for relief under the section is made in the manner required thereby to direct the auditor to cancel the assessment, etc., without regard to whether the lands affected are or are not situated within the county in which such applica-

tion is filed, the remedy thus provided can be no less efficacious in the matter of safeguarding the rights of all the parties than would be any remedy which may be afforded for securing the identical relief through the courts. Conceivably, by the foregoing considerations the legislature of 1917 was moved to enact said section and so make it one of the constituents of the fiscal system of the state.

The discussion thus far has proceeded upon the assumption that the fiscal affairs of counties are nothing less than the fiscal affairs of the state itself. This assumption, however, is more than a mere assumption or supposition. It is a postulate to which assent must without qualification yield; for, as has often been reiterated by the cases, these propositions may be set down as fundamental or at least so thoroughly established as to be entirely removed from the field of speculation or the realms of legitimate controversy: ██ "1. That counties, as political entities or subdivisions of the state, are governmental agencies, all the powers and functions of which 'have a *direct* and *exclusive* reference to the general policy of the state, and are, in fact, but a branch of the general administration of that policy.' (1 Dillon on Municipal Corporations, 5th ed., sec. 35; *County of Sacramento* v. *Chambers,* 33 Cal. App. 142, 146 [164 Pac. 613]; *County of San Mateo* v. *Coburn,* 130 Cal. 636 [63 Pac. 78, 621]; *Reclamation Dist. No. 1500* v. *Superior Court,* 171 Cal. 672, 679 [154 Pac. 845]; *Dillwood* v. *Reicks,* 42 Cal. App. 602, 607 [184 Pac. 35].) ██ 2. That, as a corollary of the foregoing proposition, 'the state may, through its legislature, and in the exercise of its sovereign power and will, in all cases where the people themselves have not restricted or qualified such exercise of that power, apportion and delegate to the counties any of the functions which belong to it,' and, 'on the other hand, the state may take back and itself resume the exercise of certain functions which it had delegated to those local agencies.' (*County of Sacramento* v. *Chambers,* 33 Cal. App. 149 [164 Pac. 613].)" (See *Reclamation District* v. *Superior Court,* 171 Cal. 672, 679, 680 [154 Pac. 845]; *Watson* v. *Greely,* 67 Cal. App. 328, 337 [227 Pac. 664].)

The case of *Reclamation District* v. *Superior Court, supra,* is illuminating upon the subject in hand, and thus it speaks in the language of Mr. Justice Sloss: "The public buildings,

roads, and bridges of a county are not the private property of the county in such sense as to authorize the county to object to the taking or damaging thereof by the state for public purposes. The counties are governmental agencies of the state (*County of San Mateo* v. *Coburn,* 130 Cal. 631 [63 Pac. 78, 621]), and the property entrusted to their governmental management is public property. The proprietary interest in all such property belongs to the public, and if there be a legal title in the county, it is a title held in trust for the whole public. (*Board of Education* v. *Martin,* 92 Cal. 209 [28 Pac. 799]; *People* v. *Holladay,* 93 Cal. 241 [27 Am. St. Rep. 186, 29 Pac. 54]; *Heffner* v. *Cass and Morgan Counties,* 193 Ill. 439 [58 L. R. A. 353, 62 N. E. 201].) In the absence of constitutional restrictions, the legislature has full control of the property held by the counties as agencies of the state, and may dispose of that property without the consent of the county or without compensating it. (*City of Edwardsville* v. *County of Madison,* 251 Ill. 265 [37 L. R. A. (N. S.) 101, 96 N. E. 238].) Upon analogous principles, it has been established by a long line of decisions, in this state as well as elsewhere, that, except as restrained by constitutional limitations, the legislature may alter the boundaries and extent of counties at will, may consolidate two or more into one, or divide and create new counties out of the territory of counties already existent. 'Upon the creation of a new county out of the territory of another, the legislature, in the absence of constitutional restrictions, may make such provision with" reference to the public property and debts, or their divisions, as to it may seem just. . . . ' (*Los Angeles County* v. *Orange County,* 97 Cal. 329 [32 Pac. 316; *Orange County* v. *Los Angeles County,* 114 Cal. 390 [46 Pac. 173]; *Tulare County* v. *Kings County,* 117 Cal. 195 [49 Pac. 8]; *Colusa County* v. *Glenn County,* 124 Cal. 498 [57 Pac. 477]; *Riverside County* v. *San Bernardino County,* 134 Cal. 517 [66 Pac. 788]; *Laramie County* v. *Albany County,* 92 U. S. 307 [23 L. Ed. 552].)'' (See, also, cases cited in footnotes following section 1 of article XIII of the Constitution, p. 704 et seq., of Treadwell's fifth edition of the state's organic law.)

It is thus readily to be seen that when the state, through its legislature, deals with the governmental affairs of

counties, it deals with itself. As would be so in the case of principal and agent, as that relation is understood in the law governing contracts between private parties, the state may at any time, except in those instances in which the people themselves have in their constitution interdicted legislative interference, confer upon or withdraw from the counties such of its sovereign powers as it may deem essential to the proper or convenient administration of its sovereign authority and duties. In line with this firmly established principle, the people have by their constitution conferred upon the legislature unlimited power in matters of taxation, except as restricted by the constitution.

"This is one of the attributes of sovereignty which the people have placed in its (the legislature's) hands; and they have entrusted its exercise to its discretion, either in the manner or to the extent to which it is to be applied. . . . For the purpose of apportioning this benefit, the legislature may determine in advance what property will be benefited, by designating the district within which it is to be collected, as well as the property upon which it is to be imposed, or it may appoint a commission or delegate to a subordinate agency the power to ascertain the extent of this benefit. It may itself declare that the entire state is benefited, and authorize the burden to be borne by a public tax, or it may declare that all or a portion of the property within a limited region is benefited, either according to its value or in proportion to its actual benefit, to be specifically ascertained by actual determination of officers appointed therefor." (*In re Madera Irr. Dist.*, 92 Cal. 296, 324, 325 [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272] ; Const., art. XIII, sec. 1.)

It is hardly necessary to say, in view of the principles above considered, and which are so well established as of the essence of our governmental policy, that the doctrine of "due process of law" can have no application to any case growing out of section 3804 (b) of the Political Code. As stated, a state, in dealing with matters appertaining to the administration of the governmental affairs of counties, deals with itself. As also in effect stated, the dominant thought at the bottom of section 3804 (b) is to insure owners of property situated within the state unmolested enjoyment of their constitutional right to be protected against double taxation, and, as the state, in said section, seeks merely but

justly to correct its own wrongs or those of its agents committed while engaged in fixing the tax burdens which must in particular years be borne by such property owners, the mode thus devised itself squares sufficiently with the juridical concept of the doctrine of "due process," etc., assuming, and only assuming, that that doctrine has any application to such proceedings as are authorized by the act in question.

We now come to the consideration of the proposition upon which the trial court planted its decision, to wit: that the proceeding in mandate instituted by the petitioner was barred by the statute of limitations and also by laches. Neither in its findings nor its conclusion of law does the court specifically declare by what particular provisions of the statute of limitations this action or proceeding in *mandamus* is barred. It will be noted, though, that the answer sets up sections 338, subdivision 1, and 343 'of the Code of Civil Procedure, as in bar of the several causes of actions set forth in the petition, and the discussion of the points thus made by respondents by the court in its written opinion indicates that it was upon section 338 that the court below based its conclusion that the several causes of action pleaded in the petition were barred.

Section 338, subdivision 1, of the Code of Civil Procedure declares that "an action upon a liability created by statute, other than a penalty or forfeiture," shall be commenced within three years (after the cause of action shall have accrued—see section 312 of said code).

Section 343 provides: "An action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued."

Respondents, in their brief, as did the trial court in its written opinion, proceeding upon the hypothesis that the relief herein demanded "is based upon a liability created by statute," contend, as the court held, contrary to the position of petitioner that its right to commence this proceeding did not arise until the demand for the cancellation of the assessments was made to the board of supervisors, that, as to the present proceeding, the statute of limitations began to run from the time of the operative effect of section 3804 (b) of the Political Code. In other words, the theory of the decision below is that petitioner's right to the relief

herein sought accrued on the twenty-seventh day of July, 1917—the effective date of section 3804 (b) of the Political Code—and that, while the petitioner was required to file its demand and proof of payment of taxes on the lands in question for the years designated in the petition with the board of supervisors before it would be entitled to the writ herein sought, such filing was "merely a step in the enforcement of petitioner's remedy," which became available to it immediately upon the going into effect of said section, and should have been invoked within the period of time prescribed by the statute of limitations appropriate to such a case as this. This conclusion, it is asserted, is supported by the following cases: *Harby* v. *Board of Education,* 2 Cal. App. 418 [83 Pac. 1081]; *People* v. *California Safe Deposit & Trust Co.,* 41 Cal. App. 727, 731 [183 Pac. 289]; *Barnes* v. *Glide,* 117 Cal. 1, 8 [59 Am. St. Rep. 153, 48 Pac. 804]; *County of San Luis Obispo* v. *Gage et al.,* 139 Cal. 398, 404 [73 Pac. 174]; *Wittman* v. *Board of Police Commrs.,* 19 Cal. App. 229, 231, 232 [125 Pac. 265]; *Jones* v. *Board of Police Commrs.,* 141 Cal. 96, 97 [74 Pac. 696].

In *Harby* v. *Board of Education,* a writ of mandate was petitioned for, and directed to the board of education of the city of San Francisco, to compel said board to restore petitioner to the position of vice-principal of a grammar school of said city, from which position she had, over three years previous to the application for the writ, been removed by said board. A demurrer to the petition upon the general ground and on the further ground that the proceeding was barred by section 338, subdivision 1, of the Code of Civil Procedure, was sustained. On appeal, the judgment was sustained upon the ground that the action was barred by the provisions of said section 338, subdivision 1. The wrong, if any, committed against the petitioner in that case was in the act of removal by the board of education, and, thereupon, immediately, there accrued to her as against the board a right of action to have the wrong, if any, redressed, or to have restored any right of which thus she had been deprived. No demand upon the board of education to restore her to the position was required to entitle her to appeal to the courts for relief. The same is true (and, in line with the Harby case, the supreme court so held) in the cases

of *Wittman* v. *Board of Police Commrs.* and *Jones* v. *Police Commrs.* In those cases the petitioners were by the commissioners removed from membership of the police department of the city of San Francisco, in the first named case the chief of police and in the last named a patrolman. In each of those cases, a period of over three years elapsed between the date of the act of removal and the date upon which the petitioner applied for a writ of mandate to compel the board of police commissioners to restore the applicant for a writ to the position in the department from which he had been ousted. As stated, in each case, the supreme court, on appeal, properly held that the statute had run against the right of the petitioner to maintain the action. Obviously, those cases are no different from the ordinary cases in which the gist of the action is in some specific wrongful act, as for instance, where a contract has been breached or a tort committed, immediately upon the breach of the contract or the commission of the tortious act, a right of action accrues to the injured party against the wrongdoer.

The other cases cited by respondents and hereinabove named disclose a situation somewhat different from that of the three cases just briefly examined. In some of those cases a preliminary step by way of a demand upon some administrative or other body or tribunal to perform an act falling within the scope of the official duties thereof was required to be taken as a condition precedent to the right of the interested party to maintain an action against said body or tribunal to compel it to do or perform the act. One of said cases may be specially noticed herein as precisely illustrative of the position of respondents. In *Barnes* v. *Glide, supra,* the following language from *Prescott* v. *Gonser,* 34 Iowa, 179, is quoted and by that case approved: "That the action of *mandamus* cannot be maintained until there has been a refusal to perform the official duty sought to be enforced is true, but to hold that a plaintiff who has a right to demand performance at any time may delay such demand indefinitely would enable him to defeat the object and purpose of the statute. It is certainly not the policy of the law to permit a party against whom the statute runs to defeat its operation by neglecting to do an act which devolves upon him in order to perfect his remedy against

another. If this were so, a party would have it in his own power to defeat the purpose of the statute in all cases of this character. He could neglect to claim that to which he is entitled for even fifty years unaffected by the statute of limitations, thereby rendering it a dead letter."

The case of *People* v. *California Safe Dep. & Trust Co.*, particularly stressed here by respondents, involved a proceeding commenced on December 7, 1907, in the name of the People of the State of California on the complaint of the state bank commissioners, under the provisions of the Bank Act (Stats. 1905, p. 304), for the purpose of securing the appointment of a receiver for the liquidation of the affairs of the said Safe Deposit & Trust Company. A receiver was appointed by the court, and on July 28, 1917, while the proceeding was still pending, one Smith applied for and was granted leave by the court to file a petition in intervention to obtain judgment against the trust company for a large sum of money alleged to be due him upon certain contracts executed by the bank prior to the commencement of the proceeding. A demurrer was filed interposing, among others, the objection that the right to litigate the claim set up in the complaint in intervention was barred by section 337, subdivision 1, of the Code of Civil Procedure. The petitioner in intervention contended that the running of the statute was suspended by reason of the receivership proceeding, and that the statute did not run for the reason that his proceeding in intervention "could have been maintained only by leave of the court first had and obtained"; that the running of the statute, therefore, began with the making of the order granting him leave to intervene. The trial court sustained the demurrer on the ground that the intervention or any right of petitioner to maintain an action for the enforcement of the indebtedness of the bank to him was barred by the section of the code named in the demurrer. The case being appealed, the appellate court affirmed the judgment, holding and declaring (as it could not logically otherwise be held) that petitioner's cause of action accrued to him prior to the application for leave to intervene—that "the statute commences to run from the time when the wrong complained of was done, and not from the time of obtaining leave to sue."

It is not necessary to refer specifically herein to the other cases cited by respondents upon the question in hand. We are satisfied that none of them is to be accepted as the criterion for the determination of that question in the instant case. They have application to the case at bar so far only as they hold that the statute appropriate to the particular case begins to run, as a general rule, from the date of the refusal by public officers to perform the act required of them as such officers by law. ■■ But the problem here is to be solved, not by analogy, but upon the solution of the question whether the legislature intended that a taxpayer seeking relief under section 3804 (b) should be limited as to the time within which to proceed, except the limitation which may be implied from the provision in the section that the application must be made before the lands affected are sold by the state.

We have seen that the established policy of the state is to make the burden of supporting the government as nearly equal as possible (Const., art. XIII, sec. 1), and that, in consequence of that policy, the design of the state, as evidenced by its revenue system, is to afford an owner of property upon which a double assessment has been levied for the same year and the same purpose—that is, for the support of the same government—legal means for securing relief from such double taxation in any case where it might occur. The section of the Political Code in question was, as is obvious, designed to afford a mode for such relief in a particular situation. When the state, through its legislature, provides a scheme or procedure for the relief of property owners in such instances, it does not intend that the aggrieved property owner, when he finds it necessary to invoke the remedy for such relief thus provided for, shall be unreasonably hampered by the interposition of objections which are founded upon ultra-technical considerations. A proceeding established for the purpose of affording such relief must, of course, be substantially followed as the legislature has created it. On the other hand, reasonable liberality in the construction of the statute establishing such proceeding should be the rule, to the end that the owner of property subject to taxation may not be compelled to pay more than is justly due from him to the government. And that it has ever been a matter of serious concern to the

law-making department of the government that no person or set of persons should be discriminated against, either purposely or innocently, by the public officers charged with the levying and the collection of taxes for public purposes, is clearly evidenced by the numerous provisions of our revenue laws giving the taxpayer reasonable opportunity for preventing, as far as may be, the imposition upon him of a tax burden unequal and unjust, when compared to the like burden likewise imposed upon others, and also for preventing the sacrifice of his property for inconsiderable sums falling due as the result of delinquency in the payment of the tax imposed upon his property for the general purposes of the government. For instance, the board of supervisors of each county is required to meet at a stated time for a stated period in every year to sit as a board of equalization for the purpose of hearing any complaints which may be made by taxpayers regarding the assessment of their property, and thus review, and correct, where inequality in the levy has been shown, the assessment as made and returned by the assessor. Again, even after real property has, by operation of law, been sold to the state by reason of delinquency upon the part of the owner in the payment of the tax assessed thereon, such owner, or any party in interest, is allowed five years from the date of such sale within which to redeem the property. (Pol. Code, secs. 3780 and 3817.) And so running all through our system of revenue laws are provisions clearly indicating that it is the policy of the state not only to apply, in distributing among property owners the burdens of taxation, the element of equality, as far as such equality may be practicable in the contrivement of a scheme for supplying the government with the requisite revenue which is always beset by great and sometimes insurmountable difficulties, but also to give to a delinquent taxpayer every reasonable opportunity, compatible with the just rights of the state in the premises, to redeem his property before it is finally sold by the state, perhaps, in some instances, far below its actual value. All these matters are mentioned for the purpose of showing that it was the design of the legislature, in framing and enacting the state's revenue laws, to present a system which would fully conserve the just rights of the state in the matter of the collection of public revenues and at the same time afford like

protection to taxpayers against oppressive exactions when required to respond to their duty to the government in that particular; that, to accomplish that important purpose, it was, and at all times is, the intention of the legislature to establish, in substantially complete detail, the various steps to be taken, or the proceedings and the procedure to be followed, and not to leave any essential matter in connection therewith to inference or conjecture, or to be worked out by analogy, unless, in the latter case, the principle invoked is so near applicable to the instant situation as to justify adopting it where otherwise either the rights of the state or those of the taxpayers may be forfeited or lost. Of course, it is a settled rule in the construction of statutes relating to taxes, or which are designed for the raising of revenue for the support of the government, that the obvious intention and meaning of the legislature should be given effect where the language will permit it, rather than to adhere too strictly to the letter, but, as is well said by Judge Cooley, in his work on Taxation, third edition, pages 363, 364, ''if there should be any leaning in such cases it would seem that it should be in the direction of the presumption that everything is expressed in the tax-laws which was intended to be expressed. The laws are framed by the government for its own needs, and, if imperfections are found to exist, the legislature, in the language of Mr. Dwarris, 'is at hand to explain its own meaning, and to express more clearly what has been obscurely expressed.' But there can be no propriety in construing such a law either with exceptional strictness amounting to hostility, or with exceptional favor beyond that accorded to other general laws. It is as unreasonable to sound a charge upon it as an enemy to individual and popular rights, as it is to seek for sophistical reason for grasping and holding by its authority every subject of taxation which the drag-net of the official force has brought within its supposed compass. The construction, without bias or prejudice, should seek the real intent of the law; and if the leaning is to strictness, it is only because it is fairly and justly presumable that the legislature, which was unrestrained in its authority over the subject, has so shaped the law as, without ambiguity or doubt, to bring within it everything it was meant should be embraced.''

It is not and will not be claimed, nor do the cases cited by respondents so hold, that the statute of limitations, as a part of our system of procedural law governing the trial and the disposition of actions and proceedings in courts of justice, .has any application to proceedings of which boards of supervisors or other governing or administrative boards have cognizance by virtue of the laws creating them and fixing their duties and powers. Section 3804 (b) does not itself fix any period of time within which the owner of real property doubly assessed for the same year and for the same purpose may proceed under its provisions, save and except that, as before pointed out, he must make his application and proof before the state has sold such property. Keeping in mind the animating principle of statutes limiting the period of time within which actions at law must be brought to save the right sought in such actions to be judicially asserted, it is difficult to reconcile the omission by the legislature to provide specifically in section 3804 (b) or in some other section of the general revenue laws a time limit within which a taxpayer may apply to the board of supervisors for the cancellation of the assessment of his real property upon which the taxes on an assessment levied on the same property for the same year and purpose have previously been paid, upon any other theory than that the state law-making body intended, *ex industria,* not to place any limitation upon the taxpayer in that respect other than the limitation to be implied from the provision contained in the section that he must apply to the board of supervisors for the relief afforded thereby before the property involved is sold by the state. The basic principle of statutes of limitations is that they are statutes of repose, "the object of which is to suppress fraudulent and stale claims from springing up at great distances of time and surprising the parties or their representatives when all proper vouchers and evidences are lost or the facts have become obscure from the lapse of time or the defective memory or death or removal of witnesses." (37 C. J., pp. 684–686.) In the instant case, the tests appropriately admitting of a provision limiting the taxpayer to a specified period of time within which to initiate proceedings to secure the relief provided by section 3804 (b) are wholly wanting. All the essential facts forming the foundation for the relief authorized by the section

are permanent public records. No question of "obscurity of the facts" through the erosive influence of time or of death or removal of witnesses or of the treachery of human memory can arise or enter into the proceeding. The facts may be shown as easily, readily, and accurately twenty years or more after the assessment and the sale have been made as they can be a month thereafter. This consideration is singularly significant when looking for the reason or reasons why the legislature omitted to fix in the statute a time limit within which property owners aggrieved as the section contemplates, should proceed to secure the relief afforded thereby. Besides all this, the prime *desideratum,* so far as the state is concerned in the matter of taxation, is to secure the payment of the taxes which constitute the revenue necessary for the support of its government, and, furthermore, as pointed out above, to enable the delinquent taxpayer to secure a return to him of his property.

■ The foregoing applies with equal cogency to the proposition, accepted by the trial court, that the right to have the assessments involved herein canceled is barred by laches. This is an equitable defense and is analogous to the statute of limitations as applicable to actions at law (and also under our present system—the reformed procedure—by virtue of the statutory provisions applicable to suits in equity). ■ But one of the essentials of the defense of laches is that the party pleading it must show that he has suffered or will suffer substantial prejudice by the long delay in bringing the action or suit. It is perfectly clear from what has already been said that no prejudice to the state can follow from the act of canceling an assessment which will result in imposing upon the owner of real property a double tax upon the same property for the same year and the same purpose. In fact, the fact itself of the enactment of section 3804 (b) is a direct recognition by the state itself of the proposition that, rather than resulting in prejudice to it, the enforcement of the remedy thus afforded to property owners under the circumstances contemplated by the section will promote the ends of simple justice both to the state and such owners.

In addition to the considerations to which the discussion has thus far been confined, it may be suggested that, in the last analysis, the remedy provided by said section involves,

in effect, nothing less than a summary mode for quieting the title or to remove a cloud from the title to the lands concerned. Indeed, it would seem to be logical to hold that, since it is plainly the intent of the section that the duty of the supervisors is to order the cancellation of an assessment subsisting upon real property which would, if enforced, have the effect of subjecting such property to double taxation for the same year and purpose, regardless of whether such property is or is not situated in the county in which such assessment has been levied, the owner of such land could maintain an action, at any time before a sale of such property is made by the state, to quiet the title thereto or to remove therefrom the cloud upon such title occasioned by such assessment, and, in such case, secure the relief so sought without being required, as a prerequisite thereto, as equity would under certain circumstances so require in cases of the same technical character, to pay the taxes embarrassing the title. But however that all may be, we are firmly persuaded that, for the reasons hereinabove set forth, the judgment is erroneous and must, therefore, be reversed.

The court below, as has been shown, expressly found that all the facts stated in the petition for the writ herein sought were and are true. It, therefore, follows that the found and established facts in the case are: That the lands were assessed by the county of Sierra for county purposes and for the years designated in the petition and in due time on the default of the owner to pay the taxes on said assessments were sold to the state by said county; that the same lands were, for the same years and for the same purpose, assessed in the county of Nevada; that the petitioner paid to the last-named county all the taxes called for by the assessments levied by it for said years; that petitioner in due legal time presented, with the tax receipts from the proper officer of Nevada County showing the payment of said taxes, its petition to the board of supervisors of Sierra County, praying for the cancellation of said assessments so levied by said county and of the certificates of sale of said property to the state, and that said board of supervisors refused to grant said application.

Accordingly, the judgment appealed from herein is reversed, and the court below is directed to enter upon the

facts stated in the petition and upon its findings its judgment granting the writ of mandate as prayed for in the petitioner's petition.

Plummer, J., and Finch, P. J., concurred.