**ASSOCIATED TELEPHONE AND TELEGRAPH COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

United States District Court
S. D. New York.

Nov. 8, 1961.

Winthrop, Stimson, Putnam & Roberts, by John J. Boland, New York City, a member of the firm, for plaintiff, Theodore F. Brophy, Robert Adelson, Robert P. Adelman, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, New York City, for defendant, U. S., Robert M. Arum, Asst. U. S. Atty., New York City, of counsel.

LEVET, District Judge.

Both plaintiff and defendant have moved for summary judgment in this action, which is a suit brought against the United States of America pursuant to United States Code, Title 28, Section 1346 for the refund of federal income taxes in the amount of $3,639,297.27, with interest, representing an alleged overpayment of plaintiff's consolidated corporate income tax for the calendar (taxable) year 1954.

### Plaintiff's Claims

Plaintiff's claims are two-fold:

1. The first is based upon an alleged erroneous disallowance by the Commissioner of Internal Revenue of credits against plaintiff's federal income tax under the provisions of Section 902 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 902, covering taxes paid to foreign countries.

2. The second is predicated upon an alleged erroneous reduction by the Commissioner of the basis of certain stock sold by an affiliated corporation under the provisions of Section 1502 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1502, authorizing the Secretary or his delegate to prescribe such regulations as are deemed necessary to determine the tax liability of an affiliated group of corporations.

### THE FIRST QUESTION

#### Facts

The material and relevant facts affecting both claims have been stipulated (see stipulation dated May 17, 1961). These facts insofar as they pertain to the first claim of plaintiff may be summarized as follows:

1. Plaintiff, Associated Telephone and Telegraph Company (hereinafter designated as "Associated"), is a Delaware corporation with its principal place of business at 730 Third Avenue, New York, N. Y.

2. Automatic Electric Company (hereinafter designated as "Automatic") is a wholly-owned subsidiary of Associated, organized under the laws of the State of Delaware.

3. Filcrest Company, Limited (hereinafter designated as "Filcrest") for all relevant periods was a corporation duly organized and validly existing under the laws of the Dominion of Canada, being a wholly-owned subsidiary of Automatic.

4. Pan-American Telephone and Telegraph Company (hereinafter designated

as "Panco"), another corporation included in the affiliated group of plaintiff Associated, was a wholly-owned subsidiary of Automatic and for all relevant periods a duly organized and existing corporation under the laws of the State of Delaware.

5. On November 11, 1954 and November 15, 1954, the directors and stockholders of Filcrest, at meetings held in Chicago, Illinois, adopted resolutions providing for the liquidation of Filcrest; on November 25, 1954, the Supreme Court of Ontario, Canada, authorized the liquidation of Filcrest. Insofar as it relates to the instant action, the "winding up" of a Canadian corporation is the same as a liquidation of an American corporation.

6. On December 15, 1954, the Filcrest liquidator, appointed by the Supreme Court of Ontario, Canada, distributed assets to Automatic, conceded by the parties hereto to have an aggregate fair market value of $9,574,386.10. Of this sum, $283,396.13 was paid directly to the Director of the Department of Internal Revenue, Taxation Division, of the Dominion of Canada by the liquidator in satisfaction of the 5% dividend withholding tax imposed by Article XI.2 of the Income Tax Convention between the United States and Canada and the Canadian Income Tax Act, said tax authorities having previously determined that the amount of Filcrest's undistributed earnings and profits for Canadian tax purposes was $5,667,922.60 ($5,485,486.30 Canadian). The gain thus realized by Automatic on the liquidating distribution from Filcrest was reported as a long-term capital gain on plaintiff's 1954 consolidated return hereinafter mentioned.

7. Commencing with the taxable (calendar) year 1952, and for the taxable years 1953 and 1954, plaintiff filed consolidated federal income tax returns for itself and its subsidiary corporations (Automatic, Filcrest and Panco)—the "affiliated group." On or about September 15, 1955, plaintiff duly filed with the Delaware District Director of Internal Revenue (the "District Director") a consolidated federal income tax return (the "1954 consolidated return") for the affili-

ated group on Treasury Department Form 1120 for the calendar year 1954 under the provisions of Sections 1501 and 6012(a) of the Internal Revenue Code of 1954, as amended (the "1954 Code") 26 U.S.C.A. §§ 1501, 6012(a). The 1954 consolidated return disclosed consolidated taxable income in the amount of $14,969,-808.42 and a consolidated income tax liability in the amount of $5,189,174.48, which latter amount was paid to the District Director within the time prescribed by law.

8. On December 15, 1954, at the time of Filcrest's liquidating dividend to Automatic, Filcrest, for federal income tax purposes, had accumulated earnings and profits after February 28, 1913 from Canadian sources in the amount of $6,-322,008.64. With respect to such accumulated earnings and profits, Filcrest had paid to the Dominion of Canada and the Provinces of Quebec and Ontario income and/or excess profits taxes in the aggregate amount of $2,387,564.86.

9. The liquidating distribution referred to above in paragraph 6 was treated (by plaintiff) on the 1954 consolidated return, to the extent of Filcrest's accumulated earnings and profits, as a "dividend" within the meaning of Section 902(a) of the 1954 Code; and, accordingly, pursuant to the provisions of Sections 901, 902 and 904 of the 1954 Code, 26 U.S.C.A. §§ 901, 902, 904 (as interpreted by plaintiff), plaintiff claimed a foreign tax credit for Canadian taxes in the amount of $2,387,564.86 (exclusive of the credit claimed under Section 901 for the amount of $283,396.13, the amount of the 5% Canadian tax withheld from the liquidating distribution).

10. The Commissioner of Internal Revenue of the United States of America (the "Commissioner") in determining the amount of the deficiency with respect to the 1954 consolidated return, however, through his agents and deputies, disallowed the above-mentioned $2,387,564.86 of the foreign tax credit claimed by plaintiff on the ground that liquidating distributions resulted in capital gain or loss for tax purposes and are not to be

considered as "dividends" for purposes of Section 902(a) of the 1954 Code, the effect of which was to increase the amount of the consolidated federal income tax for the year 1954 by the sum of $2,-387,564.86.

11. The plaintiff, after receipt of the "30-day letter" asserting other deficiencies (referred to in the Second Claim of plaintiff herein), paid the total asserted deficiency and interest and filed a claim for refund, which was disallowed, all as set forth in the stipulation above referred to.

## Issue

The question presented to this court is, whether Automatic, a wholly-owned subsidiary of plaintiff, included in plaintiff's consolidated return for the year 1954, is entitled to a foreign tax credit for that year for income and/or excess profits taxes paid to the Dominion of Canada and the Provinces of Quebec and Ontario by Filcrest, with respect to Filcrest's accumulated earnings and profits since February 28, 1913, which were received by Automatic in the form of a liquidating distribution during the year 1954.

## Statutes

The relevant portions of the pertinent sections of the Internal Revenue Code of 1954 are as follows:

"§ 301. *Distributions of property*

"(a) In General.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a) ) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

"(b) *Amount distributed.*—

"(1) *General rule.*—For purposes of this section, the amount of any distribution shall be—

"(A) *Noncorporate distributees.*—If the shareholder is not a corporation, the amount of money received, plus the fair market value of the other property received.

"(B) *Corporate distributees.*—If the shareholder is a corporation, the amount of money received, plus whichever of the following is the lesser:

"(i) the fair market value of the other property received; or

"(ii) the adjusted basis (in the hands of the distributing corporation immediately before the distribution) of the other property received, increased in the amount of gain to the distributing corporation which is recognized under subsection (b) or (c) of section 311.

"(2) *Reduction for liabilities.*—The amount of any distribution determined under paragraph (1) shall be reduced (but not below zero) by—

"(A) the amount of any liability of the corporation assumed by the shareholder in connection with the distribution, and

"(B) the amount of any liability to which the property received by the shareholder is subject immediately before, and immediately after, the distribution.

"(3) *Determination of fair market value.*—For purposes of this section, fair market value shall be determined as of the date of the distribution.

"(c) *Amount taxable.*—In the case of a distribution to which subsection (a) applies—

"(1) *Amount constituting dividend.*—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

"(2) *Amount applied against basis.*—That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.

"(3) *Amount in excess of basis.*—

"(A) *In general.*—Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it ex-

ceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property.

"(B) *Distributions out of increase in value accrued before March 1, 1913.*—That portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock and to the extent that it is out of increase in value accrued before March 1, 1913, shall be exempt from tax.

"(d) *Basis.*—The basis of property received in a distribution to which subsection (a) applies shall be—

"(1) *Noncorporate distributees.*—If the shareholder is not a corporation, the fair market value of such property.

"(2) *Corporate distributees.*—If the shareholder is a corporation, whichever of the following is the lesser:

"(A) the fair market value of such property; or

"(B) the adjusted basis (in the hands of the distributing corporation immediately before the distribution) of such property, increased in the amount of gain to the distributing corporation which is recognized under subsection (b) or (c) of section 311."

"§ 316. *Dividend defined*

"(a) *General rule.*—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders—

"(1) out of its earnings and profits accumulated after February 28, 1913, or

"(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection."

"§ 331. *Gain or loss to shareholders in corporate liquidations*

"(a) *General rule.*—

"(1) *Complete liquidations.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

"(2) *Partial liquidations.*—Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock.

"(b) *Nonapplication of section 301.*—Section 301 (relating to effects on shareholder of distributions of property) shall not apply to any distribution of property in partial or complete liquidation."

"§ 901. *Taxes of foreign countries and of possessions of United States*

"(a) *Allowance of credit.*—If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under section 902. Such choice may be made or changed at any time prior to the expiration of the period prescribed for making a claim for credit or refund of the tax against which the credit is allowable.

The credit shall not be allowed against the tax imposed by section 531 (relating to the tax on accumulated earnings), against the additional tax imposed for the taxable year under section 1333 (relating to war loss recoveries), or against the personal holding company tax imposed by section 541.

"(b) *Amount allowed.*—Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

"(1) *Citizens and domestic corporations.*—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; * * *."

"§ 902. *Credit for corporate stockholder in foreign corporation*

"(a) *Treatment of taxes paid by foreign corporation.*—For purposes of this subpart, a domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation from which it receives dividends in any taxable year shall be deemed to have paid the same proportion of any income, war profits, or excess profits taxes paid or deemed to be paid by such foreign corporation to any foreign country or to any possession of the United States, on or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends bears to the amount of such accumulated profits."

"§ 904. *Limitation on credit*

"(a) *Limitation.*—The amount of the credit in respect of the tax paid or accrued to any country shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources within such country (but not in excess of the tax-

payer's entire taxable income) bears to his entire taxable income for the same taxable year."

## Positions of Parties

The pertinent question is whether the liquidating distribution from Filcrest to Automatic is included within the meaning of the term "dividends" as that term is used in Section 902(a), so as to qualify it for the so-called "deemed to be paid credit" provided in that section.

## Plaintiff's Position

The plaintiff's arguments in support of its contention in substance are as follows:

1. The term "dividends" as used in Section 902(a) of the 1954 Code is specifically defined in Section 316(a), 26 U.S.C.A. § 316(a), thereof for purposes of the entire income tax law; it clearly includes liquidating dividends as well as ordinary dividend distributions.

2. Under Section 238(e) of the Revenue Act of 1921 (the earliest predecessor of Section 902(a) of the 1954 Code), the term "dividends" as used therein was intended by the Congress and interpreted by the Treasury Department to include liquidating dividends of the type involved herein; and there is nothing in the legislative history of any subsequent act of Congress indicating a Congressional intent to revise the tax treatment of such liquidating dividends under the foreign tax credit provisions of the income tax law.

3. The term "dividends" as used elsewhere in the same subchapter of the 1954 Code in which Section 902(a) is located has been held to include liquidating dividends, and the same term as used in Section 902(a) must be construed in pari materia therewith.

4. Treatment of the liquidating distribution in question as a "dividend" is consistent with and supported by the Income Tax Convention between the United States and the Dominion of Canada and the taxation of such distribution as a "dividend" by the Canadian tax authorities thereunder.

## Defendant's Position

The defendant's arguments in support of its contention are as follows:

1. Section 331(b) of the 1954 Code, 26 U.S.C.A. § 331(b), expressly provides that "Section 301 * * * shall not apply to any distribution of property in * * * complete liquidation." Therefore, Section 316(a), which defines the term "dividends," cannot apply to a distribution in complete liquidation since the express language contained in this section makes the term "dividends" applicable only to a "distribution of property" to which Section 301, 26 U.S.C.A. § 301, applies.

2. The legislative history of Section 902(a) (and its predecessor sections) directly parallels that of Section 243(a) (and its predecessor sections). Since the term "dividends" as used in Section 243 (a), 26 U.S.C.A. § 243(a), does not include a distribution in liquidation, it follows that the term "dividends" as used in Section 902(a) does not include a distribution in complete liquidation.

3. Congress did not intend to allow a foreign tax credit for liquidating distributions under Section 902(a), nor a dividend received deduction under Section 243(a). · Congress could not have intended to treat a liquidating distribution as a sale or exchange for one purpose and as a "dividend" for the purpose of Sections 902(a) and 243(a), since an interrelation of these two distinct concepts in respect to one distribution would produce absurd results in many cases.

4. The term "dividends" as used in many other sections of the 1954 Code does not include a liquidating distribution. An interpretation of Section 902 (a) to include a liquidating distribution would, in effect, require a similar interpretation of the term as used in Sections 34, 116, 243(a), 244 and 247, 26 U.S.C.A. §§ 34, 116, 243(a), 244, 247.

5. The Income Tax Convention between the United States and the Dominion of Canada is completely irrelevant to the issue raised herein.

## Purpose and Effect of the Tax Credit

The first act of Congress, comparable to § 902(a), which gave domestic corporations credit on United States taxes for taxes paid to any foreign country during the same taxable year, was § 238(e) of the Revenue Act of 1921. Senator Smoot, on the floor of the Senate, indicated that the purposes of this provision were to mitigate the evil of double taxation and to equate foreign subsidiaries with foreign branch office operations of domestic corporations by giving to the former substantially the same foreign tax credit benefits which were already available to the latter. (61 Cong.Rec. 7184.)

The courts have similarly stated that the purpose was to avoid double or duplicate taxation and that a secondary objective was to encourage American foreign trade. Burnet v. Chicago Portrait Co., 1932, 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587; American Chicle Co. v. U. S., 1942, 316 U.S. 450, 62 S.Ct. 1144, 86 L.Ed. 1591; W. K. Buckley, Inc. v. Commissioner of Internal Rev., 2 Cir., 1946, 158 F.2d 158; Aluminum Co. of America v. United States, 3 Cir., 1941, 123 F.2d 615; Commissioner of Internal Rev. v. American Metal Co., 2 Cir., 1955, 221 F.2d 134, cert. denied, 1955, 350 U.S. 829, 76 S.Ct. 61, 100 L.Ed. 740.

The broad purposes of these statutes in the foreign investment area have been indicated as follows:

"It is important to put the revenue considerations in proper perspective; they should be considered in the light of what might be achieved. The immediate objective of the program is to enlarge the production of critical and scarce materials available in the underdeveloped areas. Merging with this immediate purpose is the long-range objective to broaden 'the raw material and industrial base for the expanding world economy of the future.' Along with this expansion would go an increase in the living standards of the underdeveloped areas. Progress along these lines is just as vital to the United States as

it is to the underdeveloped areas."
Lyons, Private Investment Abroad
and the Federal Income Tax, 37 Va.
L.Rev. 909, 926 (1951).

The importance of increased foreign
investment and consequently the foreign
tax credit has been recognized by many
writers as follows:

"Today a very important objective
of the foreign policy of this nation is
the economic development of under-
developed areas of the world outside
of the orbit of the Soviet Union.
The need for large scale participa-
tion by private capital in this eco-
nomic development is recognized by
every person who has studied this
problem." Baker and Sarabia, The
Function of Tax Incentives in Inter-
national Trade, 26 Tul.L.Rev. 405,
425 (1952).

Moreover, a writer on tax incentives to
foreign investment has written:

"Many claim that private invest-
ment can carry out some or all of the
foreign economic policies of the Unit-
ed States. A few question whether
private investment is an appropriate
means of implementing any of them.
Each side can summon up clear ex-
amples in support of its position.
Foreign investment can provide a
new source of capital and coupled
with American 'know-how' can serve
as a means of carrying American
business and social ideas abroad. It
can develop sources of needed raw
materials, securing them to the use
of the United States. * * *" 8
Stan.L.Rev. 77, 81–82 (1955).

See also Kaczmarek, Tax Saving Incen-
tives to Foreign Trade, 47 Geo.L.J. 88
(1958); Surrey, Current Issues in the
Taxation of Corporate Foreign Invest-
ment, 56 Colum.L.Rev. 815 (1956).

## Discussion

At the outset, we deem it necessary to
present the guides that govern our statu-
tory analysis.

To begin, this court is well
aware of the principle that the allowance
of deductions or credits in respect to tax-
es paid to other sovereigns is a privilege
and a matter of Congressional grace.
See Federated Mutual Implement & Hard.
Ins. Co. v. C. I. R., 8 Cir., 1959, 266 F.2d
66, 70, citing Burroughs Adding Mach.
Co. v. Terwilliger, 6 Cir., 1943, 135 F.2d
608; Keasbey & Mattison Co. v. Rothen-
sies, 3 Cir., 1943, 133 F.2d 894, cert. de-
nied, 1943, 320 U.S. 739, 64 S.Ct. 39, 88
L.Ed. 438; Omega Chemical Co. v. Com-
missioner, 1935, 31 B.T.A., 1108; George
W. Helme Co. v. United States, 1938, 87
Ct.Cl. 474, 23 F.Supp. 787, cert. denied,
1938, 305 U.S. 645, 59 S.Ct. 145, 83
L.Ed. 417. But cf. Gentsch v. Goodyear
Tire & Rubber Co., 6 Cir., 1945, 151 F.2d
997. However, it is axiomatic that "A
statute providing relief from double taxa-
tion should be liberally construed." 84
C.J.S. Taxation § 41, citing Central Pac.
Ry. Co. v. Costa, 84 Cal.App. 577, 258 P.
991. It is also a general principle of law
that one relief provision should not be
construed in derogation of another relief
provision unless such a result is plainly
required by the statutory language or at
least by the legislative history thereof.
Helvering v. Bliss, 1934, 293 U.S. 144, 55
S.Ct. 17, 79 L.Ed. 246; United States v.
Pleasants, 1939, 305 U.S. 357, 59 S.Ct.
281, 83 L.Ed. 217; Merrill v. United
States, Ct.Cl., 1952, 105 F.Supp. 379, 122
Ct.Cl. 566; Pitcairn Company v. United
States, Ct.Cl., 1960, 180 F.Supp. 582.

Another governing principle is
that where the language of a statute
adequately expresses the intention of the
legislature, it must be given effect re-
gardless of the consequences. 82 C.J.S.
Statutes § 326, citing Brown v. Magru-
der, D.C.D.Md.1938, 25 F.Supp. 161,
rev'd on other grounds, 4 Cir., 1939,
106 F.2d 428, 106 F.2d 1004, cert. de-
nied, 1939, 308 U.S. 624, 60 S.Ct. 379, 84
L.Ed. 521; DeRuiz v. DeRuiz, D.C.Cir.,
1936, 66 App.D.C. 370, 88 F.2d 752, 753;
Carr-Consolidated Biscuit Company v.
Moore, D.C.M.D.Penn.1954, 125 F.Supp.
423; Moncrief v. Hobby, D.C.D.Md.
1955, 133 F.Supp. 152, aff'd sub nom.
Moncrief v. Folsom, 4 Cir., 1956, 233 F.2d
471; In re Shear, D.C.N.D.Cal.1956,

139 F.Supp. 217. In a case involving taxation, Mr. Justice Cardozo wrote:

" * * * We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it." Anderson v. Wilson, 1933, 289 U.S. 20, 27, 53 S.Ct. 417, 420, 77 L.Ed. 1004.

In another tax case, Mr. Justice Brandeis wrote in similar vein:

" * * * The statute was evidently drawn with care. Its language is plain and unambiguous. What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions' transcends the judicial function. Compare United States v. Weitzel, 246 U.S. 533, 543, [38 S.Ct. 381, 62 L.Ed. 872]; Peoria & Pekin Union Ry. Co. v. United States, 263 U.S. 528, 534, 535 [44 S.Ct. 194, 68 L.Ed. 427]." Iselin v. United States, 1926, 270 U.S. 245, 250–251, 46 S.Ct. 248, 250, 70 L.Ed. 566.

In Gould v. Gould, 1917, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211, the opinion states:

"In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the Government, and in favor of the citizen. United States v. Wigglesworth [, 28 Fed.Cas. p. 595, No. 16,690.] 2 Story, 369; American Net & Twine Co. v. Worthington, 141 U.S. 468, 474, [12 S.Ct. 55, 35 L.Ed. 821]; Benziger v. United States, 192 U.S. 38, 55 [, 24 S.Ct. 189, 48 L.Ed. 331.]"

See also Hartranft v. Wiegmann, 1887, 121 U.S. 609, 616, 7 S.Ct. 1240, 30 L.Ed. 1012; United States v. Merriam, 1923, 263 U.S. 179, 187–188, 44 S.Ct. 69, 68 L.Ed. 240; Haiku Sugar Co. v. Johnstone, 9 Cir., 1918, 249 F. 103; Edwards v. Wabash Ry. Co., 2 Cir., 1920, 264 F. 610.

In attempting to sustain its position, the plaintiff asserts that the effect of the language of Sections 316, 901 and 902 unequivocally provide as follows:

(a) Domestic corporations are allowed by Section 901 a credit against their United States income tax (i) for all foreign taxes paid or accrued by them during the year and (ii) for foreign income taxes which under Section 902(a) are deemed to have been paid or accrued by them during such year, subject only to the limitations contained in Section 904.

(b) Section 902(a) refers to the receipt of "dividends in any taxable year" as a basis for the "deemed to be paid credit" of this section.

(c) Section 316 defines the term "dividend" for the purposes of this subtitle (which includes Sections 901–904) to mean "any distribution of property made by a corporation to its shareholders—(1) out of its earnings and profits accumulated after February 28, 1913."

(d) The liquidating distribution by Filcrest to Automatic constituted a distribution of all of Filcrest's earnings and profits accumulated after February 28, 1913 and, thus, it is asserted, qualified as a dividend for the purposes of the foreign tax credit provisions of Sections 901 and 902(a) above, since plaintiff had paid the Canadian authorities the sum of $2,387,564.86 in taxes on the said earnings and profits accumulated after February 28, 1913 from Canadian sources which amounted to $6,322,008.64.

The government's position in reference to the statutes directly involved appears to be as follows:

(a) The government concedes that Section 902(a) of the 1954 Code grants a credit to domestic corporations receiving "dividends" from a foreign subsidiary in the amount of the income taxes paid to a foreign country, on or with respect to

the accumulated profits represented in such dividends.

(b) The government also admits that if the distribution had been made entirely out of accumulated profits *and* if it had been made as a fully taxable dividend rather than paid to Automatic in exchange for its stock, Section 902(a) would have permitted the application of the full credit here sought.

(c) The government, however, then points out that such was not the case since a large part of the distribution was made out of capital of Filcrest rather than out of its accumulated profits.

(d) Counsel for the government next asserts that even as to the portion of the distribution which may be deemed to have been paid out of accumulated profits, no credit may be claimed for the taxes paid by Filcrest to Canada.

(e) The reason advanced to sustain the foregoing denial of credit for such taxes is "because the legal nature and effect of the distribution in complete liquidation of Filcrest differ materially from a *fully taxable 'dividend'* as that word is used in Section 902(a) and Section 316." (Emphasis supplied by the court.)

To support this contention, the government relies upon Hellmich v. Hellman, 1928, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544. Thus, the government argues that Congress, by enacting Section 331(a) (1) of the 1954 Code, automatically eliminated liquidating dividends from inclusion in the term "dividends" wherever it appears in the 1954 Code (including Sections 316(a) and 902(a) ).

Defendant asserts therefore that Congress in granting *individual* taxpayers surtax relief for corporation liquidations in 1924 must have intended to change the credit provision which it had enacted for corporations in 1921 and to revive the pre-1921 double taxation of profits realized by foreign subsidiaries when remitted by way of liquidating dividends to their domestic corporate parents.

The government argues that the case of Hellmich v. Hellman, supra, is the most significant judicial precedent demonstrating that the term "dividend" does not include a liquidating distribution. Upon analysis, however, this decision does not aid the defendant. In Hellman, supra, there was a liquidation distribution. The issue was whether the gains realized by stockholders from the amounts distributed in the liquidation of the assets of a dissolved corporation, out of its earnings or profits accumulated since February 28, 1913, *were taxable* to them as other "gains or profits," or whether the amounts so distributed were "dividends" exempt from the normal tax. The court stated:

"Sec. 201(a) of the Act defined the term 'dividend' as 'any distribution made by a corporation * * * to its shareholders * * * whether in cash or in other property * * *, out of its earnings or profits accumulated since February 28, 1913. * * *.' Sec. 201(c) provided that: 'Amounts distributed in the liquidation of a corporation shall be treated as payments in exchange for stock or shares, and any gain or profit realized thereby shall be taxed to the distributee as other gains or profits.' Sec. 216(a) provided that for the purpose of determining the 'normal tax' upon the net income of an individual (§ 210), there should be allowed as a credit the 'amount received as dividends from a corporation which is taxable * * * upon its net income.' [276 U.S. at pp. 234–235, 48 S.Ct. at page 244.]

\* \* \* \* \* \*

"It is true that if § 201(a) stood alone its broad definition of the term 'dividend' would apparently include distributions made to stockholders in the liquidation of a corporation— * * *. [276 U.S. at pp. 236–237, 48 S.Ct. at page 245].

"However, when § 201(a) and § 201(c) are read together, under the long-established rule that the intention of the lawmaker is to be deduced from a view of every material part of the statute, Kohlsaat v. Murphy, 96 U.S. 153, 159, 24 L.Ed. 844,

we think it clear that the general definition of a dividend in § 201(a) was not intended to apply to distributions made to stockholders in the liquidation of a corporation, but that it was intended that such distributions should be governed by § 201(c), which, dealing specifically with such liquidation provided that the amounts distributed should 'be treated as payments in exchange for stock' and that any gain realized thereby should be taxed to the stockholders 'as other gains or profits.' This brings the two sections into entire harmony, and gives to each its natural meaning and due effect. * * *" [276 U.S. at p. 237, 48 S.Ct. at pages 244, 245.].

Upon the basis of the Hellman decision, supra, under the Revenue Act of 1918, the government is not warranted in concluding that the "sale or exchange" treatment for liquidating distributions, reintroduced by the 1924 Act and contained in all subsequent revenue acts, removes such distributions from inclusion in the term "dividend" whenever such term appears in the 1954 Code. The government also cites Langstaff v. Lucas, 6 Cir., 1926, 13 F.2d 1022, aff'g D.C.W.D.Ky.1925, 9 F.2d 691, cert. denied, 1926, 273 U.S. 721, 47 S.Ct. 111, 71 L.Ed. 858, to support its contention. That case involved facts similar to the Hellman case, supra, and was decided under the Revenue Act of 1918. The court held that the liquidating distribution involved would be treated as the proceeds of the sale of stock in the corporation.

An analysis of the government's stand indicates that Hellman, supra, as well as Langstaff, supra, both deal solely with the *method of tax computation to be applied to a liquidating distribution.* Section 201 (a) of the Revenue Act of 1918 defined a dividend. Section 201(c) indicated that a liquidating distribution was to be treated as an exchange for tax computation purposes. The net effect of the cases was that a regular dividend would be exempt from the normal tax and would be taxed at surtax rates while liquidating distributions would be treated as exchanges, the gain subject to the normal tax and the surtax. This does not result in barring the use of the term "dividend" in reference to a liquidating distribution. It merely indicates that *for tax computation purposes* the treatment afforded a liquidating distribution is different from that of a regular dividend in the ordinary course of business. The court stated in Hellman, supra: "It is true that if § 201 (a) stood alone its broad definition of the term 'dividend' would apparently include distributions * * * in liquidation * *." (276 U.S. at page 236, 48 S.Ct. at page 245, 72 L.Ed. 544.) Thus, the court simply stated that if Sections 201(a) and 201(c) are read together then the tax computation treatment of the sections are different. Also, the fact that a liquidating distribution is included in the general dividend section, that is, Section 201, is evidence that in a broad sense such distributions are dividends. The Langstaff case, supra, further supports our view, for there the court held that a liquidating distribution was "within the broad definition of 'dividend' in section 201(a) * * *." (Emphasis added.) (13 F.2d at 1022.)

The case of Freeport Sulphur Company v. United States, Ct.Cl., 1958, 163 F.Supp. 648, modified, 1959, 172 F.Supp. 462, the government urges, is directly in point. In that case, tax credit was similarly claimed by and denied to the Freeport Sulphur Company under Section 131 (f) of the 1939 Code, 26 U.S.C.A. § 131 (f), now Section 902(a) of the 1954 Code.

Faced with Hellmich v. Hellman, supra, and believing that some "clue" to the Congressional intention behind the use of the word "dividends" in Section 131(f) was necessary, the decision in Sulphur, denying relief to that plaintiff, went on to say:

" * * * If the distribution made by the Cuban corporation had been made as an ordinary dividend on the Cuban company's stock, the plaintiff distributee-shareholder would have had to pay a much higher rate of tax on the whole distribution, to the extent that it was out of earnings and

profits, as ordinary income and would have been entitled to the foreign tax credit provided in section 131(f) of the Code. However, the taxes which plaintiff would have had to pay on such regular dividends as ordinary income, even with the benefit of the foreign tax credit, would have been much more than the capital gains tax payable on the dividend as a liquidating distribution without the benefit of any foreign tax credit. Accordingly, we are of the opinion that Congress did not intend to give a distributee-shareholder of a liquidating foreign corporation both the benefit of the lower capital gains rate admittedly applicable to liquidating dividends under section 115(c) of the Code, and also the benefit of foreign tax credits provided for in section 131(f) of the Code." (163 F.Supp. at p. 651.)

With due respect to the eminent court in the Sulphur case, this court believes that the result was erroneous for the following reasons:

(a) There is no indication that Congress intended that allowance of the "deemed to be paid credit" should hinge upon such mathematical comparisons as those referred to by the Sulphur decision and urged here by the government.

(b) The court appears to have disregarded the fact that in any case involving the liquidation of a foreign subsidiary, the question whether the capital gains tax which would be payable without any foreign tax credit might be higher or lower than the amount of tax which would be payable after allowance of such tax credit in the case of regular dividends, will invariably depend upon the amount of the foreign taxes paid by the subsidiary (i. e., the applicable foreign tax rate) with respect to its accumulated earnings and profits as compared with the amount of capital gains recognized upon the liquidation.

(c) The court, in computing the amount of the regular dividends, hypothetically assumed, for purposes of comparison with the capital gains tax payable without any credit, that the Cuban subsidiary would have distributed all of its accumulated earnings and profits as a regular dividend before liquidating.

(d) There is no tangible evidence to sustain the court's statement that "Congress did not intend to give a distributee-shareholder of a liquidating foreign corporation both the benefit of a lower capital gains rate admittedly applicable to liquidating dividends under section 115(c) of the Code, and also the benefit of foreign tax credits provided for in section 131(f) of the Code." In other words, it is my belief that there is no evidence to indicate that the reduction in the tax rate on capital gains was intended as a derogation of the foreign tax credits concerned.

In this connection, the court failed to properly heed its own prior decisions with respect to statutory construction, to the effect that, one relief provision should not be construed in derogation of another relief provision in the absence of a clear Congressional intent. See United States v. Pleasants, 1939, 305 U.S. 357, 59 S.Ct. 281, 83 L.Ed. 217; Merrill v. United States, Ct.Cl., 1952, 105 F.Supp. 379, 122 Ct.Cl. 566; Pitcairn v. United States, Ct. Cl., 1960, 180 F.Supp. 582.

The government states that "Section 331(b) of the 1954 Code expressly provides that 'Section 301 * * * shall not apply to any distribution of property in * * * complete liquidation.' Thus, Section 316(a) which defines the term 'dividends,' cannot apply to a distribution in complete liquidation since the express language contained in Section 316(a) makes the term dividends applicable only to a 'distribution of property' to which Section 301 applies." (Government's revised memorandum, p. 7.)

Section 301 indicates that in distributions of property (except distributions specifically provided for) the amount taxable could be considered as an amount constituting a dividend or an amount applied against the basis of the stock. The extent of the amount constituting the dividend is determined by reference to Section 316.

Section 331 concerns gain or loss in liquidations and treats such gain or loss as an exchange. It specifically states that Section 301 shall not apply here. This is obvious since Section 301 applies except where otherwise provided, and it is otherwise provided in Section 331.

■ Section 316 defines a dividend for "income tax" purposes, and the last sentence of Section 316(a) reads: "To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be *treated as a distribution of property* for purposes of this subsection." (Emphasis added.) Section 316 in its definition of a dividend contains the following language: " * * * the term 'dividend' means *any distribution of property* * * * (1) out of its earnings and profits * * *." (Emphasis added.) Thus, the language, "treated as a distribution of property," merely includes a Section 301 transaction within the meaning of Section 316's "any distribution of property." It does not limit Section 316 to Section 301. The last sentence simply states that if we have a Section 301 distribution, you apply Section 316 to determine the amount constituting a dividend. I see no language limiting Section 316 to Section 301.

Section 131(f) (2) was enacted in 1942 as an amendment to the 1939 Code (now Section 902(b) of the 1954 Code). Prior to 1942, a domestic parent corporation, which operated abroad through one directly-owned foreign subsidiary ("S–1"), which in turn owned another foreign subsidiary ("S–2"), was entitled to a foreign tax credit *only* with respect to its own foreign taxes and the foreign taxes paid by "S–1," even though the dividends received by the domestic parent from "S–1" represented earnings of "S–2" which company had paid substantial foreign taxes with respect thereto. See Burroughs Adding Mach. Co. v. Terwilliger, 6 Cir., 1943, 135 F.2d 608. This disparate treatment obviously discriminated in favor of domestic corporations whose foreign operations were conducted entirely through branches or through *directly-owned* foreign subsidiaries. Consequently, this resulted in double taxation when the earnings of corporation "S–2" were remitted through corporation "S–1" to the domestic parent.

The 1942 amendment removed this inequality of double taxation. See Burroughs Adding Machine Co. case, supra.

Apparently, the purpose of the credit provisions of Sections 902(a) and (b) of the 1954 Code was to provide domestic corporations with a credit against their United States income tax for foreign taxes previously paid or accrued as such earnings of foreign subsidiaries (or subsidiaries of subsidiaries) are remitted in the form of distributions to the domestic parent. The sine qua non is the return to the domestic parent when the earnings become includible in the domestic parent's income.

No basis for discrimination between liquidating dividends and ordinary dividends for the purposes of this credit is evident.

The government argues that the House Ways and Means Committee, in commenting on the then proposed Section 206 of the Revenue Bill of 1950, stated that its understanding was that the term "dividend" as used in Section 131(f) of the 1939 Code (Section 902(a) of the 1954 Code) did not include a liquidation distribution. This observation is of little weight. Justice Brandeis in Penn Mutual Co. v. Lederer, 1920, 252 U.S. 523, 538, 40 S.Ct. 397, 402, 64 L.Ed. 698, stated:

"* * * But no aid could possibly be derived from the legislative history of another act passed nearly six years after the one in question. Further answer to the argument based on the legislative history of the later act would, therefore, be inappropriate."

See Fire Companies Bldg. Corp. v. Commissioner of Int. Rev., 2 Cir., 1931, 54 F.2d 488, cert. denied, 1932, 286 U.S. 546, 52 S.Ct. 498, 76 L.Ed. 1283; Rodner v. United States, D.C.S.D.N.Y., 1957, 149

F.Supp. 233; Fisher Flouring Mills Co. v. United States, 9 Cir., 1958, 270 F.2d 27. Also note that the Revenue Bill of 1950 was never passed.

Section 904 of the 1954 Code, the only limitation prescribed for foreign tax credits, does not bar the relief plaintiff seeks.

The plaintiff states that Section 904 was and is the only limitation on foreign tax credits allowed by Sections 901 and 902 with respect to such income. See I. B. Dexter, 1942, 47 B.T.A. 285, acquiescence, 1948–2 Cum.Bull. 1; Helvering v. Nell, 4 Cir., 1944, 139 F.2d 865; James H. Brace, 1952, 11 CCH Tax Ct. Mem. 906; Rev.Rul. 54–15, 1954–1 Cum.Bull. 129.

It is arguable that the numerator of the limiting fraction of Section 904 (i. e., the foreign source income) must include only income which is "fully taxable" under United States law and from this assumption it could be implied that Congress could not have intended to include liquidating dividends since they are taxable at only capital gains rates.

However, this position with respect to capital gains situations has been recognized as invalid by the Commissioner and the courts. I. B. Dexter, supra; Helvering v. Nell, supra; James H. Brace, supra. The Commissioner also recognized this in his concession in Rev. Rul. 54–15, 1954–1 Cum.Bull. 129 and in his inclusion in the instant case of the liquidating dividend in the numerator of the Section 904 fraction for the purpose of allowing a credit in regard to the 5% dividend withholding tax paid to Canada.

Section 904, as indicated, imposes a limitation on the foreign tax credit. The fraction which is computed as a result of this section prevents the taxpayer from receiving a credit for foreign tax rates which are higher than the effective United States tax rate. Sections 861 and 862, 26 U.S.C.A. §§ 861, 862, distinguish between "income from sources within the United States" and "income from sources without the United States." These two sections provide the basis for determining the Section 904 limiting fraction.

Section 861(a) (2), in effect, provides that "dividends" from domestic corporations are treated as "income from sources within the United States" and Section 862(a) (2), in effect, provides that "dividends" from foreign corporations are treated as "income from sources without the United States."

Furthermore, Section 861(a) (6) when read together with Section 864, 26 U.S. C.A. § 864, provides that gains from the sale or exchange of property located outside the United States shall be treated as "income from sources without the United States." Section 862(a) (6) provides that when the property is located within the United States, gains from the sale or exchange shall be treated as "income from sources within the United States."

In the instant case, the District Director included the amount of Automatic's taxable income from the Filcrest distribution in the numerator of the Section 904 limiting fraction thereby acknowledging that it was derived from a foreign source. Inclusion of the liquidating distribution for purposes of the Section 904 fraction could only be done on the ground that this amount represented dividends from a foreign corporation pursuant to Section 862(a) (2). This view appears to be in harmony with a Fourth Circuit decision decided under Section 119 of the Revenue Act of 1936, which provision was substantially identical with Sections 861, 862 and 864 of the 1954 Code. Hay v. Commissioner of Internal Revenue, 4 Cir., 1944, 145 F.2d 1001, cert. denied, 1945, 324 U.S. 863, 65 S.Ct. 868, 89 L.Ed. 1419. Since all of the corporate action with respect to the liquidating distribution took place within the United States, it would appear that if the distribution was viewed as a sale or exchange of the Filcrest stock, and not a "dividend" for foreign tax credit purposes, the gain would be income derived from United States sources and, hence, not includible in the numerator of the Section 904 fraction. Thus, if

the liquidating distribution is treated as a dividend under Section 904 in order to compute the limiting fraction, it seems reasonably to also include it in Section 902 for purposes of computing the credit.

The intention of Congress to restrict the limitations to Section 904 is evidenced by the reenactment of the limitation provisions of Section 131(b) of the 1939 Code as Section 904 of the 1954 Code after and in the face of (1) the Dexter, Nell and Brace decisions, supra, and Rev.Rul. 54-15, 1954-1 Cum.Bull. 129, and (2) the acquiescence of the Commissioner in 1948 in the Dexter case. See 1948-2 Cum.Bull. 1.

The doctrine of legislative reenactment is well established. In Heald v. District of Columbia, 1920, 254 U.S. 20, 23, 41 S.Ct. 42, 43, 65 L.Ed. 106, Chief Justice White spoke of the settled rule that "where provisions of a statute had previous to their re-enactment a settled significance, that meaning will continue to attach to them in the absence of plain implication to the contrary." See McK. Statutes, § 75; 82 C.J.S. Statutes § 370 (b).

As stated by one of the judges of the Court of Appeals of this circuit:

"It is a familiar and well-established rule that, where a statute that has been construed by the courts has been re-enacted in the same or substantially the same terms, the Legislature is presumed to have been familiar with its construction, and to have adopted it as a part of the law, unless a different intention is indicated; and the same principle is applied to statutes and parts of statutes which have been re-enacted after they have been construed by the legislative or executive departments of the government. The Supreme Court has decided that the re-enactment by Congress, without change, of a statute which had previously received long continued executive construction, is an adoption by Congress of such construction.

United States v. G. Falk & Bros., 204 U.S. 143, 152, 27 S.Ct. 191, 51 L.Ed. 411; United States v. Cerecedo Hermanos y Compania, 209 U.S. 337, 339, 28 S.Ct. 532, 52 L.Ed. 821. We think that principle is applicable to the question herein involved. Congress, by re-enacting the act without substantial change in the provision now under consideration, adopted the construction which the Treasury Department for 15 years had placed upon it. We are under obligation to give to the act the interpretation which Congress intended it should have." Edwards v. Wabash Ry. Co., 2 Cir., 1920, 264 F. 610, 618.

See Aluminum Co. of America v. United States, 3 Cir., 1941, 123 F.2d 615; Helvering v. Winmill, 1938, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52. But cf. American Chicle Co. v. United States, 1942, 316 U.S. 450, 62 S.Ct. 1144, 86 L.Ed. 1591.

This court does not find it necessary, for purposes of this case, to decide whether the term "dividends" as used in Section 243(a) excludes liquidating distributions. It may be observed that the cases cited by the defendant do not conclusively establish that liquidating dividends are excluded from the term "dividends" in Section 243(a).

The basic differences between Sections 243(a) and 902(a) make it improper for this court to interpret the meaning of Section 243(a) solely for the purpose of ascertaining the scope of the term "dividends" in Section 902(a). In short, Section 243(a) does not control.

Section 243(a) was originally enacted as Section 234(a) (6) of the Revenue Act of 1918. It has always applied to every corporate shareholder regardless of the amount of stock owned in the distributor corporation. The section is used in computing the taxable income of recipient corporation and has no application to taxability of foreign source income nor the tax credits available with respect to such income.

Section 902(a), on the other hand, is applied only after the amount of

taxable income and the tax thereon has been computed. The purpose of the section, as indicated above, was to provide relief for domestic corporations with foreign subsidiaries and place such subsidiary operations on the same plane as domestic corporations who operate abroad by means of foreign branches. It does not follow, as defendant contends, that a finding that the term "dividends" in Section 902(a) includes a liquidating distribution would automatically require a finding that liquidating distributions are likewise included in Section 243(a).

Section 201(a) of the 1921 Act defined the term "dividend" as follows:

"* * * The term 'dividend' * * * means any distribution made by a corporation to its shareholders * * * out of its earnings or profits accumulated since February 28, 1913 * * *."

Section 316(a) of the 1954 Act is as follows:

"* * * the term 'dividend' means any distribution of property made by a corporation to its shareholders—

"(1) out of its earnings and profits accumulated after February 28, 1913, * * *." [1]

The 1921 Act provided no special treatment of either partial or complete liquidations. However, Article 1545 of the Treasury Department's Regulation 62 adopted under the 1921 Act provided as follows:

"Distributions in Liquidation.— Where a Corporation distributes all of its property in complete liquidation or dissolution, the gain realized by the stockholder from the transaction, computed under Section 202, is taxable *as a dividend* to the extent that it is paid out of earnings or profits of the corporation accumulated since February 28, 1913." (Emphasis added.)

Prior to 1921, no distinction was made between "ordinary income" and "capital gains" with respect to corporations. The same ordinary income tax rates applied to both.

In the Act of 1921, Section 206, the Congress provided individual taxpayers in the higher surtax brackets with tax relief from the progressive surtax rates by prescribing a 12½% ceiling tax rate with respect to gains from the sale or exchange of "capital assets." See Section 206 of the Revenue Act of 1921; House Ways and Means Committee Report, H.R.Rep. No. 350, 67th Cong., 1st Sess. 10–11 (1921). However, the law continued to provide "ordinary" income taxes for corporate capital gains. See H.R.Rep. No. 486, 67th Cong., 1st Sess. 20 (1921).

In the 1918 and 1921 Revenue Acts, liquidating dividends were taxed the same as regular "dividend" income to both individual and corporate stockholders. In the Revenue Act of 1924, Section 201(c) thereof provided "capital gains" relief to individual stockholders in the higher surtax brackets with respect to gains from corporate liquidations. This relief limited the individual tax on such gains to the then maximum capital gains rate of 12½%.

Section 201(c) of the Revenue Act of 1924 in the pertinent portion provides:

"Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 202, but shall be recognized only to the extent provided in section 203. In the case of amounts distributed in partial liquidation

[1]. For the provisions of the equivalent statutes in the intervening years between 1921 and 1953 see the following: Act of 1924, Section 201(a); Act of 1926, Section 201(a); Acts of 1928, 1932, 1934, 1936, 1938, 1939, Section 115(a).

(other than a distribution within the provisions of subdivision (g) of section 203 of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits within the meaning of subdivision (b) of this section for the purpose of determining the taxability of subsequent distributions by the corporation."

The purpose of this provision was declared by the House Ways and Means Committee Report as follows:

"The existing law has no provision similar to subdivision (c) of the Bill, but the Treasury has construed the existing law as taxing liquidating dividends, *not as capital gains, but as dividends subject to the surtax rates.* The proposed Bill, as did the 1918 Act, treats a liquidating dividend as a sale of the stock to the corporation and recognizes the true effect of such a distribution." (Emphasis added.) See H.R.Rep. No. 179, 68th Cong., 1st Sess. 11 (1924).

However, domestic corporations continued to report liquidating dividends from their foreign subsidiaries as ordinary income as they did before under the 1921 Act. Nevertheless, defendant appears to claim that by granting individual taxpayers surtax relief in respect to corporate liquidations in the 1924 Act, Congress intended to eliminate the credit provisions it had enacted for corporations in 1921 and to revert to the pre-1921 double taxation of profits realized by foreign subsidiaries when remitted to the domestic parent corporation by way of liquidating dividends.

Thus, nothing in the 1924 Act or its legislative history provides any basis for derogation of the credit for foreign taxes paid on a liquidating distribution.

In 1942, Congress amended Section 117 of the Revenue Act of 1939, 26 U.S. C.A. § 117, to provide tax relief for long-term capital gains of corporations. See Section 117 of the Revenue Act of 1939 as amended by the additions of subsections (a) (10) and (11) by Act of October 21, 1942.

Thus, the 1942 Act provided corporations with the same 25% maximum tax rate on long-term capital gains which had been provided for individuals. However, nothing in the legislative history of the 1942 Act indicates any Congressional intent to thereby affect foreign tax credits on liquidating dividends.

In 1935, the Treasury Department and Congress appear to have recognized, at least inferentially, that the definition of "dividend" in Section 115(a) of the 1934 Act (now Section 316(a) of the 1954 Code) included liquidating dividends. In Section 583 of the 1954 Code, 26 U.S. C.A. § 583 (originally adopted in 1935 as Section 121 of the Revenue Act of 1934), which allows a deduction to banking institutions for "dividends" paid on preferred stock, liquidating dividends are expressly excluded. The provision is as follows:

"* * * there shall be allowed as a deduction from gross income, in addition to deductions otherwise provided for in this subtitle, any dividend *(not including any distribution in liquidation)* paid, within the taxable year * * * on the preferred stock of the corporation * * *." (Emphasis added.)

In plaintiff's memorandum in opposition to defendant's motion (Appendix B) a copy of a letter from the Secretary of the Treasury indicates that the parenthetical phrase above mentioned was not included in the original bill of 1935. The following quotation from the Secretary of the Treasury's letter supports this:

"* * * the term 'dividends' is too broad and should be qualified by excepting therefrom any so-called distributions in liquidation which are sometimes designated as 'liquidating dividends'. * * *"

The qualification has been subsequently retained.

Thus, there was an express provision which excluded liquidating distributions from the term "dividends." As Beauregard stated in his article dealing with distributions in liquidation as dividends, 41 Va.L.Rev. 731, 755–756:

"Many sections of the 1954 Code substantially identical with sections of the 1939 Code, use the terms 'dividend' and 'distribution in liquidation' in such a manner as to show that, absent any qualification in the particular use, the term 'dividend' ordinarily includes distributions in liquidation to the extent that accumulated profits are involved. * * * " [2]

I, therefore, conclude that the plaintiff's claim is correct. Its motion for summary judgment on the first issue must be granted, and defendant's motion denied.

### The Second Question

The facts relating to the second issue may be summarized as follows:

1. During the taxable years 1952 and 1953, Panco, a wholly-owned subsidiary of Automatic, sustained *capital* losses in the aggregate amount of $2,542,780.92, which losses were available as a consolidated net capital loss carry-over to the year 1954.

2. In 1954, Automatic sold all of its Panco stock for $1,494,900; since Automatic's adjusted basis of its Panco stock, for separate return purposes, and without regard to any adjustments by reason of having filed consolidated returns, at the close of the taxable year 1954 was $6,140,697.38, Automatic claimed a capital loss on the 1954 consolidated return in the amount of $4,645,797.38 as a result of this transaction.

3. On the 1954 consolidated return, plaintiff reported consolidated capital gains in the aggregate amount of $5,070,148.95 (of which $5,069,868.67 was realized by Automatic).

4. Plaintiff added to its claimed 1954 capital loss on Automatic's sale of Panco' stock (i. e., $4,645,797.38) capital loss carry-overs to the extent of $424,351.57, of which $391,482.49 was generated by Panco in 1952 and 1953, and thereby claimed an offset to its consolidated capital gain for that year in the amount of $5,070,148.95.

5. Upon examination and audit of the 1954 consolidated return, the Commissioner first adjusted Automatic's basis of its Panco stock by reducing it in the amount of $2,033,872.43, representing the net operating losses of Panco during the consolidated return years of 1952, 1953 and 1954, which losses were utilized by plaintiff in the consolidation and which adjustment plaintiff does not contest. This reduction in basis (i. e., $6,140,697.38 minus $2,033,872.43 equals $4,106,824.95) decreased the capital loss realized by Automatic from the sale of its Panco stock to $2,611,924.95.

6. The affiliated group had capital loss carry-overs generated by Panco in 1952 and 1953 of $391,482.49 and $32,869.08 from other sources. Against consolidated capital gains of $5,070,148.95 (see No. 3 above), plaintiff sought to offset (a) $2,611,924.95 capital loss claimed with respect to the sale of the Panco stock, and (b) $32,869.08 of 1954 capital loss deductions from other sources, and (c) $2,425,354.92 of the 1952 and 1953 capital losses of Panco (see No. 1 above).

7. However, the Commissioner further reduced Automatic's adjusted basis of its Panco stock by $2,425,354.92 (representing that part of the consolidated capital loss carry-overs generated by Panco in 1952 and 1953 used as above stated to offset the 1954 consolidated capital gain). This reduction in basis decreased the capital loss realized by Automatic on the sale of its Panco stock by the same amount, thereby resulting in a 1954 consolidated net long term capital gain in the amount of $2,307,928.92. The consolidated federal income tax for the year

2. See pages 755–757 for discussion of sections involved.

1954 was correspondingly increased by the amount of $600,061.52.

8. The net result of these procedures may be set forth graphically as follows:

| | | |
|---|---|---:|
| A. | Automatic basis for Panco stock | $6,140,697 |
| | Sale price | 1,494,900 |
| | Capital loss to Automatic | $4,645,797 |
| | 1954 consolidated return capital gains | $5,070,149 |
| | Offsets: | |
| |     Capital loss on sale of Panco stock | $4,645,797 |
| |     Other capital loss carry-overs: | |
| |         Panco  $391,482.49 | |
| |         Other    32,869.08 | $ 424,352 [3] |

| | | |
|---|---|---:|
| B. | First adjustment by Commissioner (as to basis) | |
| | Claimed by Automatic as basis | $6,140,697 |
| | Adjustment | 2,033,872 |
| | New basis as adjusted | $4,106,825 |
| | Sale price | 1,494,900 |
| | Capital loss to Automatic | $2,611,925 |

| | | |
|---|---|---:|
| C. | Second adjustment by Commissioner | |
| | Basis in B. above | $4,106,825 |
| | Adjustment by Commissioner | 2,425,355 |
| | New basis | $1,681,470 |
| | Sales price | 1,494,900 |
| | Capital loss to Automatic | $ 186,570 |

| | | | |
|---|---|---:|---:|
| D. | Resulting tax adjustment | | |
| | 1954 consolidated return capital gains | | $5,070,149 |
| | Partial Offsets: | | |
| |   Capital loss on sale of Panco stock | $ 186,570 | |
| |   Capital loss carry-over | 2,575,650** | 2,762,220 |
| | Net capital gain | | $2,307,929 |

```
          ** Panco 1952 and 1953—
                (See Stip. 12)              $2,542,780.92
                Carry-over (See Stip. 15)
                  $424,351.57
                less   391,482.49                32,869.08
                                            $2,575,650.00
```

9. The following statements concern both the first and second questions or issues presented in this action:

"18. During the years 1956 through 1958 the Commissioner, through his agents and deputies, conducted an examination and audit of the 1954 consolidated return. On February 7, 1958 and February 13, 1958 the plaintiff and the District Director, respectively, executed Treasury Department Form 872 thereby extending the period within which the federal income tax as-

3. Rounded to nearest dollar.

sessments could be made with respect to the 1954 consolidated return until July 30, 1959.

"19. On or about September 11, 1958 the District Director sent to the plaintiff a '30-day letter' on Treasury Department Form L S with which was enclosed a Revenue Agent's report which asserted a deficiency in the amount of $2,951,789.-49. Plaintiff paid the asserted deficiency in the amount of $2,951,789.49 plus interest thereon in the amount of $643,854.03 to the District Director on November 4, 1958.

"20. On or about September 30, 1959, and within the time prescribed by law, plaintiff filed with the District Director a claim for refund on Treasury Department Form 843, dated September 29, 1959, for the year 1954, in the amount of $2,951,-789.49, or such greater amount as is legally refundable, plus interest according to law. The amount specifically claimed in said claim for refund was $687,507.78 below the amount now claimed herein,—the difference consisting of:

"(a) $643,854.03 of interest which plaintiff paid, together with the asserted deficiency of $2,951,789.49, to the District Director on November 4, 1958;

"(b) $35,836.89 conceded by the Commissioner as representing the net overpayment of the 1954 consolidated federal income tax liability exclusive of the amounts here in issue (viz., $2,387,564.86 and $600,061.52 as per paragraphs '9' and '17' hereof); and

"(c) interest on Item (b) above in the amount of $7,816.86.

Therefore, the amount claimed in this suit is $3,639,297.27, or such greater amount as is legally refundable, plus interest according to law.

"21. Under date of November 23, 1959, plaintiff received a Report of Examination on Treasury Department Form L–11 in which the Commissioner, through his agents and deputies, proposed to disallow plaintiff's claim for refund. Under date of December 15, 1959, the District Director notified plaintiff by registered mail (Registration No. 36783) that plaintiff's claim for refund had been disallowed in full.

"22. All procedural requirements prescribed by law, including §§ 6532 and 7422(a) of the 1954 Code, as conditions to the institution of this action, have been duly made and fulfilled." (See stipulation dated May 17, 1961.)

The second issue presented is whether Automatic's basis for its stock in Panco must be adjusted downward[4] to the extent of capital losses realized by Panco, and availed of in the consolidated return, for the purpose of determining Automatic's loss on the sale of Panco stock in 1954.

### Treasury Regulations

The relevant provisions of the Regulations under the 1954 Code are as follows:

Treas. Reg., 26 C.F.R. 1.1016–6, promulgated under Section 1016 of the 1954 Code, 26 U.S.C.A. § 1016, specifically provides in pertinent part:

"(a) Adjustment must always be made to eliminate double deductions or their equivalent. Thus, in the case of the stock of a subsidiary company, the basis thereof must be properly adjusted for the amount of the subsidiary company's losses for the years in which consolidated returns were made."

Treas. Reg., 26 C.F.R. 1.1502–34, specifically provides:

"Sale of stock; basis for determining gain or loss.

---

4. Similar to that required for operating losses under § 1.1502–34 of the Cons.Ret.Regulations.

"(a) Scope of section. This section prescribes the basis for determining the gain or loss upon any sale or other disposition (hereinafter referred to as 'sale') by a corporation which is (or has been) a member of an affiliated group which makes (or has made) a consolidated return for any taxable year, of any share of stock issued by another member of such group (whether issued before or during the period that it was a member of the group and whether issued before, during, or after the taxable year 1929), and held by the selling corporation during any part of a period for which a consolidated return is made or required under the regulations under section 1502. For the basis in the case of a sale of bonds, see § 1.1502–35.

"(b) Sales made while selling corporation is member of affiliated group. If the sale is made within a period during which the selling corporation is a member of the affiliated group, whether or not during a consolidated return period, and whether or not, as a result of such sale, the issuing corporation ceases to be a member of the group, the basis shall be determined as follows:

"(1) The aggregate bases of all shares of stock of the issuing corporation held by each member of the affiliated group (exclusive of the issuing corporation) immediately prior to the sale, shall be determined separately for each member of the group, and adjusted in accordance with the other provisions of subtitle A of the Code, but without regard to any adjustment under the last sentence of section 1051 relating to losses of the issuing corporation sustained by such corporation after it became a member of the group.

"(2) From the combined aggregate bases as determined in subparagraph (1) of this paragraph, there shall be deducted the sum of—

"(i) All losses of such issuing corporation sustained during taxable years for which consolidated income tax returns were made or were required (whether the taxable year 1929 or any prior or subsequent taxable year) after such corporation became a member of the affiliated group and prior to the sale of the stock to the extent that such losses could not have been availed of by such corporation as net loss or net operating loss in computing its net income or taxable income, as the case may be, for such taxable years if it had made a separate return for each of such years,

\*　　\*　　\*　　\*　　\*

"(d) Definition of 'loss', 'consolidated loss', 'net loss', or 'net operating loss', and 'consolidated excess profits net income'. As used in this section the term 'loss' means either the excess over the gross income of the issuing corporation of the sum of its allowable deductions (not including any net loss or net operating loss deduction) allowable in computing consolidated taxable income or the excess over the gross income of the issuing corporation of the sum of its allowable deductions (not including any net loss or net operating loss deduction), plus the proportionate part properly attributable to such corporation of the credits relating to interest on certain Government obligations and dividends received allowable in computing consolidated normal tax net income, the consolidated special class net income or consolidated net income subject to tax determined in accordance with the Internal Revenue Code of 1939 and provisions of consolidated returns regulations applicable to the period. The term 'consolidated loss' means the excess of the sum of the losses, separately computed, over the sum of the normal tax net income, the special class net income, the net income subject to tax or the taxable income determined in ac-

cordance with the provisions of subtitle A of the Internal Revenue Code of 1954, or the Internal Revenue Code of 1939, or the Revenue Act, and pursuant to the provisions of consolidated returns regulations applicable to the period; the term 'net loss' or 'net operating loss' means the net loss or net operating loss, as the case may be, determined in accordance with the provisions of subtitle A of the Internal Revenue Code of 1954, or the Internal Revenue Code of 1939, or the Revenue Act, and pursuant to the provisions of consolidated returns regulations applicable to the period; and the term 'consolidated excess profits net income' means the consolidated excess profits net income or consolidated section 433(a) excess profits net income determined in accordance with the provisions of the Internal Revenue Code of 1939 or the Revenue Act and pursuant to the provisions of consolidated returns regulations applicable to the period."

### Discussion

As already indicated, Panco had suffered operating losses in 1952, 1953 and 1954 and capital losses in 1952 and 1953.

In determining Automatic's basis for the Panco stock, the plaintiff does not disagree with the Commissioner's decision that under Treas. Reg., 26 C.F.R. 1.1502–34(b), under the 1954 Code, the operating losses of Panco for the years 1952, 1953 and 1954, having been utilized or availed of in consolidation, could not be further availed of, and that such losses must be used to reduce the basis of Panco's stock to Automatic.

The question now remaining is whether the basis of the stock should be further reduced by the capital loss carry-over of Panco, theretofore availed of, against 1954 capital gains.

The defendant's position is as follows:

1. The privilege of filing a consolidated return is not designed to allow a taxpayer the benefit of a double deduction which would not be available to a parent corporation which did not file a consolidated return with its subsidiary.

2. The specific language of Regulations 1.1016–6(a) and 1.1502–34 authorize and require the basis adjustment.

3. An adjustment to the basis is required in order to eliminate the double deduction. Ilfeld Co. v. Hernandez, 1934, 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127.

The government argues that double deductions are repugnant to the theory of taxation and that the courts have been particularly vigilant in preventing them unless they were clearly authorized by Congress. The government's reasoning concerning § 1.1502–34 is not crystal clear.

The government states that it would "be quite astonishing" if this section could be read as prohibiting adjustment, and that the plaintiff's reading of the section is distorted and erroneous. The government argues that the regulation provides for a basis adjustment in our case, for the section is specifically designed to prevent a double deduction.

However, these statements are not accompanied by specific references to the language of the section which would support such interpretations.

The plaintiff contends that no such basis adjustment is required for *capital losses* for the following reasons:

1. The Cons. Ret. Regulations being legislative in character, govern the determination of the issue.

2. The Cons. Ret. Regulations not only do not require such a basis adjustment for *capital losses* and *capital* loss carry-overs (as distinguished from operating losses), but expressly prohibit such an adjustment.

3. The prohibition in the Cons. Ret. Regulations against such basis adjustment was deliberately intended by the Treasury Department with the express approval of both Houses of the Congress.

4. *Capital* losses are basically different from *operating* losses, both from an economic and income tax basis, which the said prohibition against basis adjust-

ment for capital losses properly recognizes.

5. Defendant's determination contravenes the direction of Congress and the Regulations and would establish retroactively a new rule productive of capricious and inequitable results.

6. Regulation 1.1016–6(a) is part of the general income tax regulations relating to basis adjustments and is not part of the Cons. Ret. Regulations and that it is a well-established principle of statutory construction that a general provision of law must always give way to a specific provision dealing with the same subject matter.

7. The Ilfeld case, supra, and other citations of the defendant have no application to the instant case.

In regard to the character of the Consolidated Return Regulations, the defendant writes: "The Consolidated Return Regulations are legislative in character and do govern the determination of this question." (Reply Brief, p. 17.)

Section 1502 of the 1954 Code provides:

"§ 1502. Regulations

"The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability."

Section 1503(a) of the 1954 Code, 26 U.S.C.A. § 1503(a), provides in part as follows:

"In any case in which a consolidated return is made or is required to be made, the tax shall be determined, computed, assessed, collected, and adjusted in accordance with the regulations under section 1502 prescribed prior to the last day prescribed by law for the filing of such return; * * *."

Section 1.1502–1(d) of the Cons. Ret. Regulations provides:

"The tax liability of the members of the affiliated group for the taxable year involved will be determined in accordance with the provisions of the regulations to which consent is given and without regard to any changes of the rules therein prescribed made subsequent to the last day prescribed by law for the filing of the return for such year."

Section 1.1502–3 of the Cons. Ret. Regulations provides:

"Applicability of other provisions of law.

"Any matter in the determination of which the provisions of the regulations under section 1502 are not applicable shall be determined in accordance with the provisions of the Code or the law applicable thereto."

The court will not consider the effect of Regulation 1.1502–34. Section 1.1502–34(b) (2) (1) (i) states that there shall be deducted from basis "all losses of such issuing corporation sustained during taxable years for which consolidated income tax returns were made or were required * * * after such corporation became a member of the affiliated group and prior to the sale of the stock to the extent that such losses could not have been availed of by such corporation as a net loss or net operating loss in computing its net income or taxable income * * * for such taxable years if it had made a separate return for each of such years."

The specific issue here is whether this section includes "capital losses" or, to further narrow the problem, whether the term "loss" above includes capital losses.

Section (d) of Regulation 1.1502–34 contains the definition of "loss," which is as follows:

" * * * the excess over the gross income of the issuing corporation of the sum of its allowable deductions * * * allowable in computing consolidated taxable income * * *."

A literal reading of Section (d) indicates that "loss" obviously does not include capital losses. The above definition requires (1) an excess of allowable deductions over gross income of the issuing corporation, and (2) said excess deductions being allowable in computing consolidated taxable income.

Capital losses of corporations are allowed as deductions under Section 1211 (a) of the 1954 Code only to the extent of capital gains. Thus, it is obvious that a corporation's capital losses could not possibly be allowable as deductions to a point in excess of such corporation's gross income on a separate return. To include capital losses in such definition would result in a disregard of the literal language of the definition. Furthermore, such inclusion would be an arithmetic fallacy.

Gross income includes all income from whatever source derived (except as otherwise provided) and includes gains derived from dealings in property. Internal Revenue Code of 1954, Section 61, 26 U.S.C.A. § 61. Thus, gross income includes gains from transactions concerning capital assets. Section 1211 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1211, indicates, that in the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges. Thus, the extent to which capital losses could be reflected in gross income of a particular year is governed by the capital gains. In a corporate situation, capital losses are allowable deductions against capital gains while losses other than capital losses are allowable deductions against gross income.

Another indication that Regulation 1.-1502–34 does not include capital losses is indicated by the limitation factor in (b)

(2) (1) (i) of the said regulation. The limitation regarding deductibility is "the extent that such losses could not have been availed of by such corporation as net loss or net operating loss * * *." In Section (d), "net loss" or "net operating loss" is determined "in accordance with the provisions of subtitle A of the Internal Revenue Code of 1954, or the Internal Revenue Code of 1939, or the Revenue Act, and pursuant to the provisions of consolidated returns regulations applicable to the period; * * *." The term "net loss" is designated as "net operating loss" under the 1954 Revenue Code and Section 172(c), 26 U.S.C.A. § 172(c), defines the term as "the excess of the deductions allowed by this chapter over the gross income." Section 172 concerns the general subject of "net operating loss deduction" and capital losses could never qualify for such deduction treatment in a corporate situation. Thus, the limitation provision in Section 34 could never apply to capital losses. This is another indication that the provisions in Section 34 do not apply to capital losses.

Also, note the similarity in the language of Section 172(c) of the Revenue Act of 1954 when it defines "net operating loss" and Section 1.1502(d) when it defines "loss." Both refer to an excess of deductions allowed over gross income. "Net operating loss" has no relationship whatsoever to capital losses and the language used reflects this. The use of similar language in Section 1.1502(d) also seems to indicate that this section does not concern capital losses.

Thus, I conclude that Section 34 does not provide for a basis reduction in regard to capital losses. However, there is no provision in Section 34 specifically providing for a double deduction in a capital loss situation. Section 34 merely concerns losses other than capital losses, and there is no reference at all to capital losses.

The allowance of double credits in tax deductions is always to be avoided where possible in construing laws passed by Congress. As declared in Ilfeld Co.

v. Hernandez, 1934, 292 U.S. 62, 68, 54 S.Ct. 596, 598, 78 L.Ed. 1127, in speaking of double deductions: "In the absence of a provision of the Act definitely requiring it, a purpose so opposed to precedent and equality of treatment of taxpayers will not be attributed to law makers." See Burnet v. Aluminum Goods Co., 1933, 287 U.S. 544, 551, 53 S.Ct. 227, 77 L.Ed. 484; United States v. Ludey, 1927, 274 U.S. 295, 301, 47 S.Ct. 608, 71 L.Ed. 1054; Burnet v. Riggs Nat. Bank, 4 Cir., 1932, 57 F.2d 980, 983–984.

Plaintiff, in attempting to distinguish the effects of operating losses and capital losses, points out that in certain cases in which double deductions were disallowed it appeared that the losses involved were operating losses. This seems to be true, although an examination of the various laws from 1918 until the enactment of the Revenue Act of 1934 shows that capital losses realized by a corporation were deductible in full against ordinary income in the same manner and to the same extent as ordinary losses. Thus, in respect to these cases, the applicable revenue act provided that a capital loss, in the case of a corporation, was deductible in full against ordinary income. Moreover, in computing the "net loss" of a corporation under the revenue acts from 1918 until 1934, capital losses of corporations were allowed in full without limitation. See Sections 204(a) and 234(a) (4) of the 1918 Act; Sections 204(a) and 234(a) (4) of the 1921 Act; Section 206(a) (2) of the 1924 Act; Section 206(a) (2) of the 1926 Act; Section 117(a) (2) of the 1928 Act, and Section 117(a) (2) of the 1932 Act.

Consequently, in such cases the court was not concerned in discriminating between operating and capital losses. Ilfeld Co. v. Hernandez, supra; McLaughlin v. Pacific Lumber Co., 1934, 293 U.S. 351, 55 S.Ct. 219, 79 L.Ed. 423; Burnet v. Riggs Nat. Bank, supra; Commissioner of Internal Revenue v. Apartment Corp., 4 Cir., 1933, 67 F.2d 3, cert. denied, 1934, 292 U.S. 631, 54 S.Ct. 639, 78 L.Ed. 1485; Greif Cooperage Corp. v. Commissioner of Internal Revenue, 3 Cir. 1936, 85 F.2d 365; Cincinnati Milling Mach. Co. v. United States, Ct.Cl. 1936, 14 F.Supp. 505, 83 Ct.Cl. 392.

The plaintiff attempts to distinguish the Ilfed case, supra, via two points of distinction, which are as follows:

"* * * On the one hand, just as the 1929 regulations expressly prohibited any basis adjustment for pre-1929 losses in the case of *sales* (the validity of which appeared to be recognized by the Court in Ilfeld), the Cons. Ret. Regulations (applicable to the instant case) expressly prohibit any such basis adjustment for '*capital* losses'. On the other hand, the 1929 regulations contained no such express limitation prohibiting basis adjustments in the case of *dissolutions* (the type of transaction involved in the Ilfeld case) and the court was not willing to assume that any was intended by either the Congress or the Treasury Department; whereas, in the instant case, the prohibition against basis adjustments for *capital* losses is expressly provided in Cons. Ret. Regulations, and (as demonstrated at pp. 68 to 76, supra) it is reasonable to assume that such prohibition was intended by the Treasury Department and approved by the Congress." (Plaintiff's Memorandum in Opposition to Defendant's Motion, pp. 84–85.)

However, this argument is not valid since it is primarily based on the assumption by plaintiff that the regulations expressly prohibit basis adjustments for capital losses. This court has been unable to find such an express provision.

The plaintiff states that the case of McLaughlin v. Pacific Lumber Co., supra, is inapposite, since there was no regulation involved expressly providing for or against a basis adjustment. (Plaintiff's answer to defendant's reply memorandum, p. 19.) This argument is not valid since the cases cited in this opinion merely support the general principle of law which provides that double

credits are to be avoided where possible in construing laws passed by Congress.

Furthermore, Treasury Regulation 1.-1016–6(a), promulgated under Section 1016 of the 1954 Code, dealing with adjustments to basis, states that "adjustments must always be made to eliminate double deductions * * *." The language of this section is clear and unequivocal and when analyzed in conjunction with case law heretofore discussed, I find that adjustment to basis is necessary regarding capital losses.

Since the provisions of the Cons. Ret. Reg. are not applicable to the problem of capital losses and to their effect on basis, it is proper to apply other applicable law, as we have done above. 26 C.F.R. 1.1502–3.

The argument that a general provision of law (Section 1.1016–6(a) must always give way to a specific provision (Section 1.1502–34) dealing with the same subject matter is not applicable here since there is no specific provision in Section 34 which provides for a double deduction. The argument that " * * * a far more reasonable conclusion would be that both the Treasury Department and the House of Representatives were fully conscious of what they were doing, and intended that there be *no* basis adjustment for capital losses similar to that required for *operating* losses under § 1.-1502–34 of the Regulations" (Plaintiff's Memorandum in Opposition to Defendant's Motion, p. 71) does not carry much weight. To receive the benefit of a double deduction requires a specific provision. It would be beyond the power of a court to grant such deduction due to the omissive features of Section 1.1502–34. To read into this section the allowance of double deduction would clearly be a judicial intrusion into a legislative area.

Section 7852(c) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7852(c), concerns items not to be twice deducted. Although this section clearly does not concern the issues regarding deductibility in our case, the language used indicates the general treatment regarding double deductions. The section indicates that items are not to be twice deducted "except as otherwise distinctly expressed or manifestly intended."

Accordingly, the motion of plaintiff for summary judgment on the second issue is denied and the motion of defendant granted.

Settle order and judgment on notice.